**In re TLC HOSPITALS, INC., a California corporation, Debtor.**

**Charles Sims, Plaintiff–Appellant,**

**v.**

**United States Department of Health and Human Services, Defendant–Appellee.**

**No. 98–16327.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 13, 1999

Filed Sept. 12, 2000

---

Rachel K. Nunes, Abbey, Weitzenberg, Hoffman & Emery, Santa Rosa, California, for the plaintiff-appellant.

Jeffrey A. Clair, Civil Division, Department of Justice, Washington, D.C., for the defendant-appellee.

Before: CANBY and SILVERMAN, Circuit Judges, and FITZGERALD,[1] District Judge

CANBY, Circuit Judge:

TLC Hospitals, Inc. ("TLC") was the operator of skilled nursing facilities that provided many of their services subject to reimbursement by Medicare, a health insurance program administered by the United States Department of Health and Human Services ("HHS"). In 1994, TLC filed a petition in bankruptcy but contin-

1. The Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation.

ued to provide Medicare nursing services for some time thereafter. Audits then revealed that HHS, at different times, had both overpaid and underpaid TLC for its services. The question before us is whether HHS can deduct pre-petition overpayments HHS made to TLC from the sums it owes to TLC for post-petition services. We conclude that HHS can recoup in this manner, and we accordingly affirm the judgment of the district court.

## BACKGROUND

The facts are undisputed.[2] TLC operated three skilled nursing facilities.[3] In June 1994, TLC filed a petition to reorganize its business under Chapter 11 of the Bankruptcy Code. TLC thereafter continued to operate the skilled nursing facilities and participate in the Medicare program until it later converted its petition to a Chapter 7 liquidation proceeding. At the time this controversy arose in the bankruptcy court, HHS had made Medicare overpayments of $112,061.00 to TLC yet owed TLC's estate $68,871.16 for pre-petition services and $46,952.84 for post-petition services. The overpayments, for the most part, related to services rendered in the 1993 fiscal period, and the underpayments related to services rendered in the 1994 fiscal period.

The parties disagreed whether HHS could deduct the amount of the 1993 overpayments from the sums HHS owed TLC for the 1994 underpayments. Upon the parties' cross-motions for summary judgment, the bankruptcy court ruled only partly in favor of HHS. Pursuant to the

setoff provision of the Bankruptcy Code, 11 U.S.C. § 553(a), the bankruptcy court allowed HHS to recover its pre-petition overpayments from any sums it owed TLC for pre-petition underpayments.[4] It recognized, however, that § 553 did not permit setoffs "across the petition date," and thus did not allow HHS to set its pre-petition overpayments off against its post-petition liabilities to the bankruptcy estate. The parties do not dispute the correctness of that interpretation of § 553. HHS contended, however, that it was entitled to the full relief it sought under the doctrine of recoupment. The bankruptcy court rejected this argument. Thus, under the bankruptcy court's ruling, HHS was entitled to set off only $68,871.16, leaving $43,189.84 in uncollected overpayments, for which it had a claim in the bankruptcy proceedings.[5] TLC's trustee was entitled to collect $46,952.84 from HHS for post-petition underpayments.

HHS appealed the denial of recoupment to the district court. There, the parties stipulated that, post-petition, HHS had underpaid the Heart of Napa facility by $5,340.28 and underpaid the Heart of Sonoma facility by $12,274.24.[6] HHS sought to effect a recoupment of these amounts. The district court reversed and remanded, concluding that HHS could recoup pre-petition overpayments from these sums. The district court based its decision both on the equitable doctrine of recoupment and on a statutory construction of the Medicare Act. TLC now appeals to this court. We have jurisdiction pursuant to 28

---

2. TLC moved to strike portions of HHS's supplemental excerpts of record and brief on the ground that the excerpts contain material that was not before the district court. We agree and grant the motion. See *Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1077 (9th Cir. 1988).

3. These facilities are referred to by the parties as the Heart of Napa, Heart of Sonoma, and Heart of Santa Clara facilities.

4. The court permitted HHS to recover, via setoff, the pre-petition overpayments from pre-petition underpayments "even though the

claims [were] on account of separate facilities and/or separate fiscal periods."

5. The $43,189.84 is the difference between $112,061.00 (overpayments) and $68,871.16 (recovery via setoff). HHS retained an unsecured claim for this amount.

6. A third TLC facility, the Heart of Santa Clara, was underpaid $29,338.32, post-petition, but the government elected not to attempt recoupment with regard to this sum, ostensibly because the Santa Clara facility had received no overpayments.

U.S.C. § 1291, and we affirm on the ground of equitable recoupment.[7]

## ANALYSIS

### Equitable Recoupment

■ Recoupment and setoff have much in common, but they have differences with important consequences in the bankruptcy context. The Bankruptcy Code provides for setoff, preserving certain rights that exist under relevant non-bankruptcy law. 11 U.S.C. § 553; *see also* 5 *Collier on Bankruptcy* ¶ 553.04, at 553–59 (15th ed. rev.1996). Under setoff, mutual debts cancel each other. These debts may arise either from separate transactions or a single transaction but must be incurred prior to the filing of a bankruptcy petition. *See* 5 *Collier* ¶ 553.10, at 553–100; *see also* 11 U.S.C. § 553(a).

■ In contrast, recoupment does not owe its legitimacy to anything in the Bankruptcy Code. As applied in bankruptcy, recoupment is an equitable doctrine that "exempts a debt from the automatic stay when the debt is inextricably tied up in the post-petition claim." *United States v. Consumer Health Servs. of Am., Inc.,* 108 F.3d 390, 395 (D.C.Cir.1997). Unlike setoff, recoupment is not limited to pre-petition claims and thus may be employed to recover across the petition date. *See generally* 5 *Collier on Bankruptcy* ¶ 553.10, at 553–104. The limitation of recoupment that balances this advantage is that the claims or rights giving rise to recoupment must arise from the *same transaction or occurrence* that gave rise to the liability sought to be enforced by the bankruptcy estate. *See id.* at ¶ 553–101.

■ The prime question before us, then, is whether HHS's overpayments for TLC's nursing services in one fiscal year arise from the same transaction as its underpayments to TLC in a later fiscal year. We conclude that the overpayments and underpayments from year to year are a part of the same transaction in the Medicare context. To explain why, it is necessary to set forth in some detail the process of Medicare reimbursement as it applied to TLC.

### Statutory and Regulatory Framework of Medicare Reimbursements

Each TLC-operated facility had entered into a Medicare "provider agreement," qualifying it to participate in Medicare Part A, 42 U.S.C. §§ 1395c–1395i–5. Part A authorizes insurance payments for care given to eligible beneficiaries by hospitals and other institutions or agencies, including skilled nursing facilities such as those operated by TLC. In accordance with the terms of the Medicare statute and the regulations promulgated by the Secretary of HHS, a participating facility is reimbursed for the "reasonable costs" of services rendered to Medicare beneficiaries. *See* 42 U.S.C. §§ 1395x(v)(1)(A), 1395f(b); 42 C.F.R. pt. 413. In order to be reimbursed, however, the participating facility, must agree to certain terms as set forth in 42 U.S.C. § 1395cc.[8]

The Medicare statute specifies an accelerated payment system to ensure that providers are paid promptly. Under this system, a Medicare provider like TLC receives periodic payments for its services on an *estimated* basis prior to an audit which determines the precise amount of reimbursement due to the provider. 42 U.S.C. § 1395g; *see generally Consumer Health Servs.,* 108 F.3d at 392. Conse-

---

7. We review de novo the district court's decision on appeal from a bankruptcy court and apply to the bankruptcy findings the same standards used by the district court. *See Kord Enters. II v. California Commerce Bank (In re Kord Enters. II),* 139 F.3d 684, 686 (9th Cir. 1998).

8. Section 1395cc includes requirements pertaining to such issues as the release of patient data to the Secretary, the return of moneys incorrectly collected from Medicare beneficiaries, the methodology for charging Medicare beneficiaries, and procedures governing a peer review process to ensure quality control. In addition, this section governs the termination of a provider agreement and penalties for improper billing.

quently, underpayments and overpayments are an expected and inevitable result of this payment system.

Regulations promulgated by the Secretary require the provider to submit a "cost report" on an annual basis. 42 C.F.R. § 413.20(b). A fiscal intermediary under contract with HHS calculates and dispenses the estimated periodic payments which are to be made "not less often than monthly." 42 U.S.C. § 1395g(a). At the end of each "reporting year," the intermediary, relying on the cost report, conducts an audit of the provider. 42 C.F.R. § 405.1803(a). The audit entails a reconciliation of the amount due to the provider under the Medicare statute with the amount of estimated interim payments dispensed for the same period. Thus, the audit reveals the precise amount of any overpayments or underpayments. *See id.;* 42 U.S.C. § 1395g(a).

Upon the conclusion of the audit, a "retroactive adjustment" is made. 42 C.F.R. § 413.64(f); *see also* 42 U.S.C. § 1395g. If the provider has been underpaid, the intermediary dispenses the difference to the provider. If there are any overpayments, the intermediary must set forth the results and explain its findings in a Notice of Program Reimbursement. *See* 42 C.F.R. § 405.1803. To recover the overpayments, the intermediary may either adjust subsequent reimbursement payments or arrange for repayment by the provider. 42 U.S.C. § 1395g(a); 42 C.F.R. §§ 405.1803(c), 413.64(f); *see also* 42 C.F.R. § 405.371(a). Thus, overpayments from one fiscal year may be recovered by adjusting the interim payments for a subsequent fiscal year.

9. As an alternative to its equitable recoupment argument, HHS contends that the plain language of the Medicare statute is dispositive of the issue and that the Bankruptcy Code does not bar the application of the Medicare Act's substantive provisions. It argues that, when engaged in continuous payments to a provider under Medicare's statutory system, HHS may not be treated as a "creditor" in the bankruptcy when it seeks to adjust for a prior overpayment. Because we hold that

*Eligibility of Medicare Adjustments for Recoupment*

We conclude that, under this specialized and continuous system of estimated payments and subsequent adjustments, HHS's overpayments and its underpayments in a subsequent fiscal year were parts of the same transaction for purposes of recoupment.[9] We have held that the crucial factor in determining whether two events are part of the same transaction is the "logical relationship" between the two. *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1403 (9th Cir.1996) (resolving a dispute between a contractor and its surety). Thus, a "transaction" may include "a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Moore v. New York Cotton Exch.*, 270 U.S. 593, 610, 46 S.Ct. 367, 70 L.Ed. 750 (1926). Although the "logical relationship" concept is not to be applied so loosely that multiple occurrences in any continuous commercial relationship would constitute one transaction, we conclude that the distinctive Medicare system of estimated payments and later adjustments does qualify as a single transaction for purposes of recoupment.[10] In the present case, the district court remarked:

> In light of these protracted billing procedures governing the on-going relationship between Medicare and its providers, it is clear that the payments at issue "logically relate" to one another; while this exchange of funds may stretch over an extended period of time, it remains part of a continuous balancing process between the parties.

HHS may recover the overpayments under the doctrine of equitable recoupment, we do not address these contentions.

10. The Medicare regulations supply their own definition of recoupment: "[t]he recovery by Medicare of any outstanding Medicare debt by reducing present or future Medicare payments and applying the amount withheld to the indebtedness." 42 C.F.R. § 405.370.

In holding that HHS's overpayments and subsequent post-petition underpayments were part of the same transaction, we join the District of Columbia Circuit. *See United States v. Consumer Health Servs. of Am., Inc.*, 108 F.3d 390, 395 (D.C.Cir.1997). As the District of Columbia Circuit said:

> [T]he key to us is the Medicare statute. Since it requires the Secretary to take into account pre-petition overpayments in order to calculate a post-petition claim ... Congress rather clearly indicated that it wanted a provider's stream of services to be considered one transaction for purposes of any claim the government would have against the provider.

*Id.* at 395.[11] We agree that in light of the statutory and regulatory provisions of the Medicare program, the reimbursement system satisfies the "transaction" requirement.

The fact that the overpayments and underpayments relate to different fiscal years does not destroy their logical relationship or indicate that they pertain to separate transactions. The Medicare statute creates a sufficient relationship between different cost years to permit recoupment. As we explained above, the fiscal intermediary generally will not begin an audit until after the provider has supplied its cost report. This cost report is not due until five months after the conclusion of the reporting period. 42 C.F.R. § 413.24(f)(2). Consequently, a reality of the complex Medicare system is that any overpayments will not be discovered, and accordingly the "retroactive adjustment" will not occur, until after the end of the cost year in which the overpayments were made. The timing of the audit is not material to the logical relationship between the overpayments and underpayments. As the District of Columbia Circuit explained:

> The audit is simply the mechanism by which the intermediary determines whether and by how much it ought to adjust subsequent periodic payments to a particular provider. Its frequency is determined by the Secretary, presumably in the interests of an efficient reimbursement scheme; it would seem to have little to do with how one conceptualizes the relation between past overpayments and current compensation due. It is the statute and regulations which dictate the effect of the audit on the provider's participation in Medicare. An audit is nothing more than a snapshot in time—whether it is monthly, annual, or decennial is, in our view, irrelevant.

*Consumer Health Servs.*, 108 F.3d at 395.

TLC urges us to adopt a contrary interpretation of "transaction" utilized by the Third Circuit in *University Med. Ctr. v. Sullivan (In re University Med. Ctr.)*, 973 F.2d 1065 (3d Cir.1992). There the court held that, in order for recoupment to apply, HHS's claim for the pre-petition overpayments and the University Medical Center's claim for post-petition services, "must arise out of a *single integrated transaction* so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Id.* at 1081 (emphasis added). In effect, the Third Circuit required the "creditor's claim [to] arise[ ] out of the *identical* transaction as the debtor's," *id.* at 1080 (emphasis added); the court explicitly rejected the logical relationship test, *id.* at 1081. Consequently, HHS could not effect a recoupment to recover pre-petition overpayments in one calendar year from its obligation to pay University Medical Center for services rendered post-petition in a subsequent calendar year. *See id.* at 1082. The court explained that: "Recovery of the 1985 overpayment, therefore, is the final act of the transactions

---

**11.** The District of Columbia Circuit also held that, apart from recoupment, the Medicare statute itself was determinative of the right of HHS to deduct prior overpayments from post-petition underpayment liabilities. *Consumer Health Servs.*, 108 F.3d at 394–95. We do not reach that ground.

that began in 1985. UMC's 1988 post-petition services were the beginning of transactions that would stretch into the future, but they were not part of the 1985 transactions." *Id.*

With all respect, we do not find this view persuasive, for reasons already set forth. Contrary to the contention of TLC, we did not endorse the Third Circuit's position in *Newbery Corp.*, 95 F.3d at 1403. Although we agreed with the Third Circuit that recoupment should only be permitted when " 'it would ... be inequitable for the debtor to enjoy the benefits of that transaction without meeting its obligations,' " *id.* (quoting *University Medical Center*, 973 F.2d at 1081), we did not accept the Third Circuit's narrow definition of "transaction," and we do not do so here.

Sound equitable considerations support HHS's right to recoup. The Medicare system reimburses estimated costs without waiting for an audit in order that providers like TLC may maintain a cash flow; those providers would otherwise find it difficult or impossible to function. Overpayments (and underpayments) are inherent in that system. It is fair for HHS to adjust for such overpayments in the operation of that system whether or not a bankruptcy has intervened. If a provider in bankruptcy does not wish to be subject to Medicare's system of adjustments, it can cease providing Medicare services. If it chooses to continue to provide those services during bankruptcy, it is not inequitable for the bankrupt or its creditors that those services be provided on the same, generally favorable, terms as those governing other providers.

CONCLUSION

For the foregoing reasons, we conclude that the bankruptcy court erred in granting summary judgment in favor of TLC on the equitable recoupment issue. The district court properly viewed the pre-petition overpayments and the post-petition underpayments as arising from the same "transaction." Consequently, HHS may recoup its overpayments by applying them against its post-petition underpayment liabilities to

the Heart of Napa and Heart of Sonoma facilities, without being affected by the automatic stay. We therefore affirm the district court's order on the sole ground of equitable recoupment.

**AFFIRMED.**