**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER, INC., *Debtor*, | No. 18-60016 BAP No. 17-1198 |
| GARDENS REGIONAL HOSPITAL AND MEDICAL CENTER LIQUIDATING TRUST, *Appellant*, v. STATE OF CALIFORNIA, AND ITS DEPARTMENT OF HEALTH CARE SERVICES, *Appellees.* | OPINION |

Appeal from the Ninth Circuit Bankruptcy Appellate Panel
Lafferty, Kurtz, and Faris, Bankruptcy Judges, Presiding

Argued and Submitted October 16, 2019
Pasadena, California

Filed September 16, 2020

Before:  Kim McLane Wardlaw and Daniel P. Collins, Circuit Judges, and Joseph F. Bataillon,[*] District Judge.

Opinion by Judge Collins

## SUMMARY[**]

### Bankruptcy

The panel affirmed in part and reversed in part the Bankruptcy Appellate Panel's decision affirming the bankruptcy court's denial of a Chapter 11 debtor's motion asserting that the State of California and its Department of Health Care Services violated the automatic bankruptcy stay by deducting certain unpaid fees from payments that the State was obligated to make to the debtor under Medi-Cal, the State's Medicaid program.

To raise Medi-Cal funding, the State imposed a "Hospital Quality Assurance Fee" ("HQAF") on non-public hospitals, such as the debtor, pursuant to a federal-law exception for certain broad-based healthcare taxes that do not contain an impermissible "hold harmless" provision. The debtor stopped paying its HQAF assessments before it filed for bankruptcy. The State recovered the prepetition HQAF debt by withholding a portion of the Medi-Cal payments it owed the hospital, including both fee-for-service

---

[*] The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

payments and "supplemental" payments under the HQAF program, and the State continued to make such deductions postpetition.

The debtor argued that the State's withholding of unpaid HQAF amounts constituted an improper "setoff" that violated the automatic stay imposed under 11 U.S.C. § 362. The bankruptcy court concluded that the limitation on setoffs did not apply because the State's withholdings amounted to equitable recoupment rather than setoff. The panel held that the claims or rights giving rise to recoupment must arise from the same transaction or occurrence that gave rise to the liability sought to be enforced by the bankruptcy estate. The test is whether the relevant rights being asserted against the debtor are sufficiently logically connected to the debtor's countervailing obligations such that they may be fairly said to constitute part of the same transaction.

The State deducted the unpaid HQAF assessments from two separate payment streams: (1) the supplemental payments that the State pays to hospitals out of the fund created by HQAF assessments; and (2) the fee-for-service payments that the debtor earned by treating Medi-Cal patients. The panel concluded that, in light of the legal and factual connections between the debtor's unpaid HQAF assessments and California's supplemental payments to the hospital, these countervailing obligations had the necessary logical relationship to justify characterizing them as arising from the same transaction for purposes of equitable recoupment. The fee-for-service payments made to the debtor, however, constituted a setoff that was subject to the restrictions of the Bankruptcy Code and was not a permissible equitable recoupment.

The panel affirmed the judgment of the BAP insofar as it held that California's deduction of unpaid HQAF assessments from the payments made to the debtor was permissible under the doctrine of equitable recoupment, but the panel reversed the BAP's judgment as to the fee-for-service payments. The panel remanded to the BAP with instructions to remand to the bankruptcy court for further proceedings.

## COUNSEL

Andrew H. Sherman (argued), Sills Cummis & Gross P.C., Newark, New Jersey; Samuel R. Maizel and John A. Moe II, Dentons US LLP, Los Angeles, California; for Appellant.

Kenneth K. Wang (argued), Deputy Attorney General; Jennifer M. Kim, Supervising Deputy Attorney General; Julie Weng-Gutierrez, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Los Angeles, California; for Appellee.

## OPINION

COLLINS, Circuit Judge:

This case requires us to address the extent to which a creditor can deduct the amounts that a bankrupt debtor owes to that creditor from other payments that the creditor owes to the debtor. The Bankruptcy Code imposes significant limitations on such deductions if they constitute a "setoff," but the courts have consistently recognized an exception to those limitations in the case of deductions that fall within the equitable doctrine of "recoupment." Here, after Gardens

Regional Hospital and Medical Center, Inc. ("Gardens Regional") filed for bankruptcy, the State of California and its Department of Health Care Services (collectively, "California" or "the State") deducted certain "fees"—which Gardens Regional had failed to pay to the State—from various payments that the State was obligated to make to Gardens Regional under its Medicaid program.  Gardens Regional contended that the deductions were impermissible setoffs, and California argued that there were instead permissible recoupments.  The bankruptcy court and the Ninth Circuit Bankruptcy Appellate Panel ("BAP") both agreed with California, but we conclude that they relied on an overbroad conception of "recoupment."  Because some of the deductions claimed by California constituted setoffs, and not recoupments, we affirm in part and reverse in part and remand for further proceedings.

## I

An understanding of this case requires a brief summary of both the structure of California's Medicaid program and the underlying background facts concerning the parties' dispute.

## A

Under the Medicaid program, the federal government provides financial support to qualifying state plans that provide "medical assistance" and other services to defined classes of individuals "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396-1.  California's approved Medicaid program, known as "Medi-Cal," is managed by Defendant Department of Health Care Services (the "Department") and provides benefits to covered individuals through two primary methods—a "fee-for-service" system and a

"managed care" system. *See Marquez v. Dep't of Health Care Servs.*, 192 Cal. Rptr. 3d 391, 397–98 (Cal. Ct. App. 2015); Cal. Welf. & Inst. Code §§ 14016.5(a)–(b), 14062, 14100.1. Under the "fee-for-service" system—which is the relevant payment method for purposes of this case—a covered individual may receive treatment at a participating healthcare provider, and Medi-Cal then directly pays that provider a specified amount for each covered service provided to the individual. *See Marquez*, 192 Cal. Rptr. 3d at 397. The amount paid for each service is determined "in one of two ways: (1) according to a specific contractual rate of payment negotiated between the hospital and an arm of the Department . . . ; or (2) for California hospitals that have not negotiated contracts . . . , on the basis of costs, in accordance with various regulatory formulas." *Mission Hosp. Reg'l Med. Ctr. v. Shewry*, 85 Cal. Rptr. 3d 639, 647 (Cal. Ct. App. 2008).[1] Gardens Regional has not negotiated its own schedule of contractual rates and is therefore considered a "noncontract" hospital.[2]

Given that Medicaid is a federal-state cost-sharing program, it is not surprising that federal law places limits on how States can raise their share of Medicaid funding. Prior to amendments enacted in 1991, some States engaged in a

---

[1] By contrast, under the "managed care" system, the State "contracts with health maintenance organizations . . . and other managed care plans to provide health coverage to Medi-Cal beneficiaries, and the plans are paid a predetermined amount for each beneficiary per month, whether or not the beneficiary actually receives services." *Marquez*, 192 Cal. Rptr. 3d at 398 (citing CAL. WELF. & INST. CODE §§ 14204, 14301(a)).

[2] Like all Medi-Cal providers, however, Gardens Regional was required to sign a "Provider Agreement," *see* CAL. WELF. & INST. CODE § 14043.2(a), and in Gardens Regional's case that agreement is a standard-form contract issued by the Department.

circular-funding practice in which they "would make payments to hospitals, collect the federal matching funds, and then recover a portion of the payments made to hospitals through the collection of a health care related tax imposed on the hospitals." *Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 544 (7th Cir. 2012). Under such schemes, the States' lower *net* payments to hospitals were effectively inflated for purposes of calculating federal matching funds. Congress eliminated this practice by providing that "the amount of federal matching funds provided to a State should be reduced by the amount of any revenues received by the State through a health care related tax *that was not broad-based* [or] that contained a *hold harmless* provision." *Id*. (emphasis added) (citing 42 U.S.C. § 1396b(w)(1)(A)(ii)–(iii)). In order to qualify as a "broad-based health care related tax," a state exaction generally must be imposed uniformly on "all non-Federal, nonpublic providers in the State," and not just on Medicaid providers. *See* 42 U.S.C. § 1396b(w)(3)(B). A broad-based tax will be considered as having an impermissible "hold harmless" provision if, *inter alia*, the Medicaid payments to a provider "var[y] based only upon the amount of the total tax paid"; the provider receives a waiver or offset of a portion of the tax; or the provider receives payments that "positively correlate[]" to the amount of the tax. *Id*. § 1396b(w)(4)(A)–(C).

Invoking this federal-law exception for certain broad-based healthcare taxes, California in 2009 passed legislation that would lead to the imposition of a "Hospital Quality Assurance Fee" ("HQAF") on non-public hospitals in the State. *See* Quality Assurance Fee Act, 2009 Cal. Stat. ch. 627, § 2. In its current form, the HQAF is imposed on most non-public, "general acute care hospital[s]" without regard to whether they participate in Medi-Cal. *See* Cal. Welf. &

Inst. Code § 14169.52(a); *see also id*. § 14169.51(*l*) (exempting, *inter alia*, certain public hospitals, long-term care hospitals, and "small and rural" hospitals). If a hospital does not pay its HQAF assessments, the statute allows the State to "immediately begin to deduct the unpaid assessment and interest from any Medi-Cal payments owed to the hospital, or . . . from any other state payments owed to the hospital." *Id.* § 14169.52(h).

The legislatively declared purpose of the HQAF is "to increase federal financial participation in order to make supplemental Medi-Cal payments to hospitals, and to help pay for health care coverage for low-income children." *Id.* § 14169.50(d). Towards that end, the statute requires that HQAF proceeds be deposited into "segregated funds" that are to be used only for certain enumerated purposes. *Id.* § 14169.50(f)(2). Those purposes are: (1) supplemental payments to private hospitals based upon their overall provision of outpatient and inpatient services, *id*. §§ 14169.54, 14169.55; (2) increased payments for Medi-Cal managed health care plans, *id*. § 14169.56; (3) direct grants to public hospitals, *id*. § 14169.58; (4) funding for health coverage for low-income children, *id*. § 14169.53(b); and (5) administrative costs, *id*. Any supplemental payments made to private hospitals under the HQAF program are "in addition to any other amounts payable to hospitals with respect to those services." *Id*. § 14169.54(a); *id*. § 14169.55(a) (same).

**B**

Gardens Regional was a private nonprofit hospital in Hawaiian Gardens, California, and since at least November 2014 it was a participating Medi-Cal provider. After Gardens Regional began experiencing significant financial difficulties, it stopped paying its HQAF assessments in

March 2015, and it ultimately filed for Chapter 11 bankruptcy in June 2016.  It ceased operations in February 2017.

According to the State, Gardens Regional owed California $699,173 in missed HQAF payments at the time it filed for bankruptcy.  Thereafter, the State fully recovered this prepetition debt by withholding a portion of its Medi-Cal payments to the hospital, which included both fee-for-service payments and "supplemental" payments under the HQAF program.  As additional HQAF assessments accrued postpetition and were likewise not paid by Gardens Regional, the State continued to deduct a portion of the fee-for-service and supplemental payments to the hospital.  All told, the State withheld a total of $4,306,426 from Gardens Regional, and it claims that Gardens Regional still owes $2,550,667 in HQAF debt.

In May 2017, as debtor in possession, Gardens Regional filed a motion with the bankruptcy court attempting to compel the State to return the amounts it had withheld, so that those funds would then be available for the benefit of the bankruptcy estate and the hospital's other creditors.[3] Gardens Regional argued that, in withholding the funds, California had violated the Bankruptcy Code's "automatic stay," which generally prohibits creditors from attempting to collect on their claims against the debtor after the filing of a bankruptcy petition.  11 U.S.C. § 362(a).  The automatic stay

---

[3] The funds withheld by California constitute the largest contested asset in the bankruptcy estate.  As it stands, the State has already recovered approximately 63% of the hospital's HQAF obligation.  By contrast, according to Gardens Regional, the hospital's other unsecured creditors are set to receive between 8% and 42% of their claims, with the final percentage depending in large part on whether the money withheld by the State must be returned.

specifically prohibits, *inter alia*, the "setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor," *id.* § 362(a)(7), and Gardens Regional argued that California's withholding of a portion of the payments due to the hospital constituted such an impermissible setoff. The State disagreed, contending that its actions were exempt from the automatic stay under the non-statutory equitable doctrine of "recoupment."

The bankruptcy court denied Gardens Regional's motion, holding that California had the right to recoup the funds because there was enough of a "logical relationship" between both the fee-for-service payments and the supplemental payments, on the one hand, and the HQAF assessments, on the other. *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 569 B.R. 788, 794–99 (Bankr. C.D. Cal. 2017). Gardens Regional appealed to the BAP, which affirmed the bankruptcy court. *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 2018 WL 1354334, at *4–6 (B.A.P. 9th Cir. March 12, 2018). Gardens Regional appealed to this court, and we have jurisdiction under 28 U.S.C. § 158(d).[4]

## II

In the proceedings below, Gardens Regional argued that the State's withholding of unpaid HQAF amounts constituted an improper "setoff" that violated the automatic stay imposed under § 362 of the Bankruptcy Code. However, we have held—and Gardens Regional

---

[4] After the bankruptcy court subsequently confirmed a plan of liquidation for Gardens Regional, we granted the liquidating trustee's motion to substitute the Gardens Regional Hospital and Medical Center Liquidating Trust as the Appellant.

acknowledges—that to the extent a creditor's actions were covered by the related but distinct doctrine of equitable "recoupment," the Code's limitations on "setoffs" would *not* apply. *See Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1403 (9th Cir. 1996) (referring to recoupment "'as a non-statutory, equitable exception to the automatic stay'" (citation omitted)); *see also id.* at 1399 ("'[T]he chief importance of the recoupment doctrine in bankruptcy is that, unlike setoff, recoupment is often thought not to be subject to the automatic stay.'" (citation omitted)). Thus, while "[r]ecoupment and setoff have much in common," the differences between these two doctrines have "important consequences in the bankruptcy context." *Sims v. U.S. Dep't of Health & Human Servs.* (*In re TLC Hosps., Inc.*), 224 F.3d 1008, 1011 (9th Cir. 2000). Here, the bankruptcy court and the BAP held that *all* of the State's withholdings of unpaid HQAF amounts constituted legitimate instances of equitable recoupment rather than setoff, but in our view this holding rested on an overly generous conception of what qualifies as "the *same transaction or occurrence*" for purposes of recoupment. *See id.*

## A

The doctrines of setoff and recoupment trace their origins back to "the era of common law pleading," when they allowed a defendant to assert certain countervailing claims that might not otherwise have been allowed under the then-stricter joinder rules. *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984). As developed in that pleading context, "[s]etoff allowed a reduction of [the] plaintiff's claim by the amount of a liquidated claim of the plaintiff to the defendant; recoupment allowed a defendant to assert a claim arising out of the same transaction as the plaintiff's claim." *Id.* at 875 n.5. Both doctrines were subsequently recognized in

bankruptcy, "setoff by statute and recoupment by decision." *Id.* at 875 (citation and footnote omitted). Although their function as pleading doctrines has not entirely disappeared in the bankruptcy context, *see Reiter v. Cooper*, 507 U.S. 258, 265 n.2 (1993), the two concepts now play a role in bankruptcy that is "very different from their original role as rules of pleading," *Lee*, 739 F.2d at 875.

As the Supreme Court has explained, the right of setoff "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)). "The defining characteristic of setoff"—as opposed to recoupment—is that, in a setoff, "'the mutual debt and claim . . . are generally those arising from *different* transactions.'" *Newbery*, 95 F.3d at 1398 (citation omitted). Although the Bankruptcy Code does not itself create setoff rights, it imposes certain federal-law limitations on their recognition in bankruptcy. For example, we have stated that, under § 553(a) of the Code, "each debt or claim sought to be offset must have arisen prior to [the] filing of the bankruptcy petition." *Id.* Section 553(a) also limits setoff in bankruptcy to the setting off of "'a *mutual* debt' owed by a creditor to the debtor against the creditor's claim against the debtor," and this "mutuality requirement" is "strictly construed." *Id.* at 1399 (emphasis added) (citation omitted). And, as noted earlier, a creditor's right to assert a "setoff" is expressly limited by the Code's automatic-stay provision. *See* 11 U.S.C. § 362(a)(7).

By contrast, the conceptual foundation of equitable recoupment is not the adjustment of separate mutual debts but the process of defining the amount owed under a single

claim. *See Reiter*, 507 U.S. at 265 n.2 ("Recoupment permits a determination of the 'just and proper liability on the main issue[.]'") (citation omitted); *Chicago Title Ins. Co. v. Seko Inv., Inc.* (*In re Seko Inv., Inc.*), 156 F.3d 1005, 1008–09 (9th Cir. 1988) ("If recoupment applies, the creditor's claim arises from the same transaction as the debtor's claim, and it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation." (simplified)). Because "recoupment is in the nature of *a right to reduce the amount of a claim*, and does not involve establishing the existence of *independent* obligations," 5 Collier on Bankruptcy ¶ 553.10 (Richard Levin & Henry J. Sommer, eds., 16th ed. 2019) (emphasis added), the caselaw has recognized that recoupment is not subject to all of the same strictures in bankruptcy as setoff. For example, because "the limits placed on setoff under section 553 generally do not apply to recoupment claims," *Newbery*, 95 F.3d at 1399, "[u]nlike setoff, recoupment is not limited to pre-petition claims and thus may be employed to recover across the petition date," *Sims*, 224 F.3d at 1011. And as noted earlier, "'unlike setoff, recoupment is often thought not to be subject to the automatic stay.'" *Newbery*, 95 F.3d at 1399 (citation omitted).

We have emphasized that the "limitation of recoupment that balances [these] advantage[s]" under bankruptcy law "is that the claims or rights giving rise to recoupment must arise from the *same transaction or occurrence* that gave rise to the liability sought to be enforced by the bankruptcy estate." *Sims*, 224 F.3d at 1011. Accordingly, we have defined recoupment in the bankruptcy context as "'the setting up of a demand arising from the *same transaction* as the plaintiff's claim or cause of action, *strictly* for the purpose of abatement or reduction of such claim.'" *Newbery*, 95 F.3d at 1399 (second emphasis added) (citation omitted). In addressing

whether the countervailing claims or rights asserted by the creditor arise from the same transaction or occurrence—and therefore qualify as a permissible recoupment for federal bankruptcy purposes—we "have held that the crucial factor . . . is the 'logical relationship' between the two." *Sims*, 224 F.3d at 1012 (quoting *Newbery*, 95 F.3d at 1403).

In *Newbery*, we derived this "logical relationship" test from the Supreme Court's analysis of pleading standards governing compulsory counterclaims in the era prior to the Federal Rules of Civil Procedure. 95 F.3d at 1402 (citing *Moore v. N.Y. Cotton Exch.*, 270 U.S. 593, 610 (1926)). That makes sense, given the common-law-pleading origins of the doctrine, *Lee*, 739 F.2d at 875, and indeed, recoupment has been described as "the ancestor of the compulsory counterclaim and setoff of the permissive counterclaim," *Coplay Cement Co. v. Willis & Paul Grp.*, 983 F.2d 1435, 1440 (7th Cir. 1993) (citations omitted); *see generally* 6 Charles Alan Wright, Arthur R. Miller, & Mary K. Kane, Federal Practice & Procedure § 1401 (3d ed. 2010). In both *Newbery* and *Sims*, we noted that the Supreme Court in *Moore* had held that whether claims or rights arise from the same transaction "'depend[s] not so much upon the immediateness of their connection as upon their logical relationship.'" *Sims*, 224 F.3d at 1012 (quoting *Moore*, 270 F.3d at 610); *see also Newbery*, 95 F.3d at 1402 (same). In *Sims*, we therefore expressly rejected "the Third Circuit's narrow definition of 'transaction,'" which in our view improperly gave dispositive weight to the temporal immediacy of the countervailing claims rather than to their logical relationship. 224 F.3d at 1014 (citing *University Med. Ctr. v. Sullivan* (*In re Univ. Med. Ctr.*), 973 F.2d 1065, 1081 (3d Cir. 1992)).

While we have thus noted the "flexible meaning" of the same-transaction requirement, *see Newbery*, 95 F.3d at 1402, we have also cautioned that "the 'logical relationship' concept is not to be applied so loosely that multiple occurrences in any continuous commercial relationship would constitute one transaction," *Sims*, 224 F.3d at 1012. The test remains whether the relevant rights being asserted against the debtor are sufficiently logically connected to the debtor's countervailing obligations such that they may be fairly said to constitute part of the same transaction. *Sims*, 224 F.3d at 1012; *Newbery*, 95 F.3d at 1401–02. Moreover, while we have rejected the Third Circuit's narrow focus on temporal proximity, we have stated our express agreement with that court's separate "observation that courts should apply the recoupment doctrine in bankruptcy cases only when 'it would . . . be inequitable for the debtor to enjoy the benefits of that transaction without meeting its obligations.'" *Newbery*, 95 F.3d at 1403 (alteration in original) (quoting *University Med. Ctr.*, 973 F.2d at 1081); *see also Sims*, 224 F.3d at 1014. Furthermore, as Collier explains, "care should be taken" in applying the doctrine of recoupment in the bankruptcy context, given that "improper application of the doctrine, coupled with its ostensibly exempt status under sections 553(a) and 362, could undermine the fundamental purposes of these statutory provisions." 5 Collier on Bankruptcy, *supra*, ¶ 553.10[3]. "[A]pplication of the doctrine in any particular case" is therefore "sometimes scrutinized from the perspective of its effect on the fundamental policies of these provisions." *Id.*; *see also Malinowski v. N.Y. State Dep't of Labor* (*In re Malinowski*), 156 F.3d 131, 134 (2d Cir. 1998) (recoupment should not be broadened "in contravention of the federal bankruptcy policies of debtor protection and equal distribution to creditors").

**B**

The proper application of these principles is illustrated by our decisions in *Newbery* and *Sims*.

The facts of *Newbery* are somewhat complex, but they are important to a proper understanding of that decision. Newbery, an electrical subcontractor, obtained from its surety, Fireman's Fund, "performance and payment bonds" that "guaranteed that Newbery's work would be completed and its employees and suppliers paid." 95 F.3d at 1396. In procuring the bonds, Newbery in turn agreed to indemnify Fireman's Fund against any losses stemming from the bonds. *Id*. Newbery subsequently abandoned its projects and "defaulted on the bonds," leaving unpaid its indemnification obligation to Fireman's Fund. *Id.* As part of an agreement between Newbery, Fireman's Fund, and Citibank (which held a security interest in Newbery's equipment), Newbery agreed to transfer the relevant projects to Fireman's Fund, which hired a subcontractor to complete them. *Id*. As part of that agreement, Citibank agreed to rent out Newbery's equipment to Fireman's Fund. *Id.* at 1396–97. Shortly after the agreement was signed, Newbery filed for bankruptcy. *Id*. at 1397. During bankruptcy proceedings, Newbery asserted a separate, multi-million-dollar claim against Citibank, and Newbery and Citibank ultimately entered into a settlement in which, *inter alia*, Citibank transferred to Newbery its right to receive rental payments from Fireman's Fund. *Id*. The result of this complex series of interrelated agreements was that Newbery was entitled to receive equipment rental payments from Fireman's Fund for Fireman's Fund's use of Newbery's former equipment to complete Newbery's former projects. *Id*. After Fireman's Fund failed to pay the rent on the equipment, Newbery brought suit. *Id*. Fireman's Fund

asserted alternative defenses of recoupment and setoff, noting that Newbery was liable to Fireman's Fund for indemnification of its losses, which Fireman's Fund suffered due to Newbery's failure to complete the projects in the first place. *Id*. at 1397 & n.4.

Applying the "logical relationship" test, we concluded that Fireman's Fund was entitled to recoupment. 95 F.3d at 1401–04. In reaching this conclusion, we relied on two key features of the resulting relationship between the rental payments due to Newbery and the claims for indemnification asserted by Fireman's Fund. *Id*. at 1402–03. First, we found it significant that the agreement between Newbery, Fireman's Fund, and Citibank that created the rental-payment obligation also incorporated by reference Newbery's original indemnification agreement with Fireman's Fund. 95 F.3d at 1402. As a result, under the applicable Arizona contract law, the two countervailing claims each arose from the same contract. *Id*. Second, we emphasized that the two obligations at issue in *Newbery* arose "from the very same acts." 95 F.3d at 1403. That conclusion made perfect sense, because Fireman's Fund was renting Newbery's equipment to complete *the very same projects for which Fireman's Fund had bonded Newbery*. We held that this factual "intertwining of opposing claims" distinguished *Newbery* from the Third Circuit's decision in *University Medical Center*, which had rejected the view that a common grounding in the same underlying contract was *alone* sufficient to support recoupment. *Id.* (citing *University Med. Ctr.*, 973 F.3d at 1081). We also rejected the Third Circuit's overly restrictive recoupment test, which further required that both debts "'arise out of a single *integrated* transaction,'" and held that the requisite factual connection was present in *Newbery*. *Id*. (quoting *University Med. Ctr.*, 973 F.3d at 1081) (emphasis added). Based on

these legal and factual connections between the two countervailing obligations in *Newbery*, we found the necessary "logical relationship" to justify recoupment. *Id.* at 1403.

In *Sims*, we likewise emphasized both the legal and factual connections between the two claims in applying the logical-relationship test. 224 F.3d at 1012–14. There, we addressed Medicare's system of making payments to providers "on an *estimated* basis prior to an audit which determines the precise amount of reimbursement due to the provider." *Id.* at 1011. At the end of each reporting year, a "fiscal intermediary under contract" with the Government would "conduct[] an audit of the provider" and determine whether the amount due for the provider's *actual* services were lower than the estimate, resulting in an overpayment. *Id.* at 1012. One option for recovering overpayments was to "adjust subsequent reimbursement payments," meaning that "overpayments from one fiscal year may be recovered by adjusting the interim payments for a subsequent fiscal year." *Id.* After TLC Hospitals, Inc. filed for bankruptcy, it argued, *inter alia*, that the Government could not recapture prepetition overpayments from postpetition reimbursements, because that would constitute an impermissible setoff "across the petition date." *Id.* at 1010. The Government, in turn, asserted that such recapture would constitute a permissible equitable recoupment. *Id.*

We agreed with the Government, holding that "under this specialized and continuous system of estimated payments and subsequent adjustments, [the Government's] overpayments and its underpayments in a subsequent fiscal year were parts of the same transaction for purposes of recoupment." 224 F.3d at 1012. In light of the "continuous balancing process between the parties," we "conclude[d] that

the distinctive Medicare system of *estimated payments and later adjustments* does qualify as a single transaction for purposes of recoupment." *Id.* (emphasis added). We further explained that "[t]he fact that the overpayments and underpayments relate to different fiscal years does not destroy their logical relationship or indicate that they pertain to separate transactions." *Id.* at 1013. The temporal delay was the inescapable result of a system in which payments were made initially on an estimated basis, subject to "retroactive adjustment" after the necessary audit could be conducted. *Id.* Because the timing had "'little to do with how one conceptualizes the relation between past overpayments and current compensation due,'" we reasoned that the "timing of the audit is not material to the logical relationship between the overpayments and underpayments." *Id.* (quoting *United States v. Consumer Health Servs. of Am., Inc.*, 108 F.3d 390, 395 (D.C. Cir. 1997)). Given the factual and legal connections between the countervailing obligations, we held that there was a sufficient logical relationship and that sound equitable considerations supported allowing the Government to invoke recoupment. *Id.* at 1014.

## III

In this case, California deducted the unpaid HQAF assessments from two separate payment streams: (1) the supplemental payments that the State pays to hospitals out of the fund created by HQAF assessments and (2) the fee-for-service payments that Gardens Regional earned by treating Medi-Cal patients. The bankruptcy court and the BAP found that the deductions from both payment streams qualified as permissible recoupment. We review decisions of the BAP de novo, and we apply the same standard of review to the bankruptcy court's decision that the BAP

applied. *Boyajian v. New Falls Corp.* (*In re Boyajian*), 564 F.3d 1088, 1090 (9th Cir. 2009). We review the bankruptcy court's legal conclusions de novo and its factual findings for clear error. *Willms v. Sanderson*, 723 F.3d 1094, 1099 (9th Cir. 2013).

## A

We conclude that, in light of the legal and factual connections between Gardens Regional's unpaid HQAF assessments and California's supplemental payments to the hospital, these countervailing obligations have the necessary logical relationship to justify characterizing them as arising from the same transaction for purposes of equitable recoupment.

As explained earlier, the California Legislature first created the HQAF program in order to take advantage of a provision in federal law allowing a State's Medicare plan to make use of certain broad-based health-care-related taxes. *See supra* at 7–8. A central feature of California's HQAF program is that it establishes a "segregated fund[]" known as the "Hospital Quality Assurance Revenue Fund" ("HQAR Fund") into which all HQAF proceeds must be deposited, and those HQAF funds may then only be used for specified purposes. Cal. Welf. & Inst. Code §§ 14167.35(a), 14169.50(f)(2). Among those purposes are, *inter alia*, "supplemental Medi-Cal payments to hospitals." *Id.* § 14169.50(f)(2). As a result, there is a direct factual and legal connection between the HQAF payments *into* the segregated HQAR Fund and the supplemental payments made to hospitals *from* that very same segregated fund.

Moreover, the overall linkage between these two streams of money is a critical feature of the HQAF program. Federal law generally does not permit a State to use circular state

funding systems (*e.g.*, taxing hospitals only to then pay them back) as a vehicle for increasing federal Medicaid matching payments, but the California HQAF program is specifically tailored to fit within a statutorily created exception to that rule. *See supra* at 6–8. Indeed, California's HQAF statute is explicit in declaring this circular funding mechanism to be a central purpose of the HQAF program: "It is the intent of the Legislature to impose a quality assurance fee *to be paid by hospitals*, which would be used to increase federal financial participation in order to make supplemental Medi-Cal payments *to hospitals*[.]" Cal. Welf. & Inst. Code § 14169.50(d) (emphasis added). This fundamental goal of the HQAF system cannot be achieved unless there is an overall connection between the HQAF assessments paid *by* hospitals *into* the segregated funds and the supplemental payments made *to* hospitals *from* those same funds.

We disagree with Gardens Regional's contention that the necessary logical relationship is missing in light of the fact that, *in the context of any given hospital*, there is no connection between the specific amount it must pay in HQAF assessments and the specific amounts it receives as supplemental payments. It is true that the two amounts are calculated according to separate, complex formulas,[5] and many hospitals receive supplemental payments without having paid any HQAF assessments.[6] Indeed, Gardens

---

[5] HQAF assessments and supplemental payments are independently calculated on a hospital-by-hospital basis based on technical factors that generally reflect the volume of treatment provided by the hospital to patients. *See*, *e.g.*, CAL. WELF. & INST. CODE §§ 14169.51(as), 14169.52(a), 14169.54(b), 14169.55(b).

[6] HQAF assessments are collected only from private hospitals, including those that do not participate in Medi-Cal, but the resulting funds can be distributed both to private hospitals and to public hospitals

Regional notes that federal law generally *prohibits* any such hospital-specific linkage between the amount of HQAF assessments levied on a particular taxpayer and the amount of any Medicaid payments to that taxpayer. *See* 42 U.S.C. § 1396b(w)(4); 42 C.F.R. § 433.68(f). In our view, however, Gardens Regional's argument that this feature precludes any finding of a logical relationship is foreclosed by *Sims*. In *Sims*, we found the requisite logical connection even though the two payment streams at issue there "relate[d] to different fiscal years" and therefore were independently calculated from one another. 224 F.3d at 1013. We held that this fact did "not destroy [the payments'] logical relationship" because the relevant statutory scheme "create[d] a sufficient relationship" between the separately calculated amounts "to permit recoupment." *Id*. Analogously, the distinctive features of the HQAF program create an essential *overall* linkage between the payment streams into and out of the HQAR Fund, and the resulting countervailing obligations of any individual hospital, even though independently and separately calculated, are sufficiently logically related to permit recoupment.

In view of the strong logical relationship among payment streams that is reflected in these unique features of the HQAF program, we conclude that this "distinctive . . . system" of continuously managing hospital payments into segregated funds against hospital payments out of those same funds is properly treated as "a single transaction for purposes of recoupment." *Sims*, 224 F.3d at 1012. Given

that do not pay the HQAF. *See supra* at 7–8. Moreover, HQAF funds are also used for purposes other than supplemental payments to hospitals, such as for providing health coverage for low-income children. CAL. WELF. & INST. CODE §§ 14169.53(b)(1)(B).

these singular features of the HQAF program, it would be "'inequitable for the debtor to enjoy the benefits of that transaction without meeting its obligations.'" *Newbery*, 95 F.3d at 1403 (citation omitted). And for the same reasons, allowing recoupment in the unique context presented here would not encroach upon, or undermine, the policy judgments reflected in the Bankruptcy Code's limitations on setoffs. *See* 5 Collier on Bankruptcy, *supra*, ¶ 553.10[3]. California therefore properly recouped Gardens Regional's unpaid HQAF assessments into the segregated funds from the HQAF-funded supplemental payments that Gardens Regional was due to receive out of those same funds.

## B

We reach the opposite conclusion with respect to California's deduction of the unpaid HQAF assessments from the fee-for-service payments made to Gardens Regional. Those deductions constitute a setoff that is subject to the restrictions of the Bankruptcy Code and not a permissible equitable recoupment.

The sorts of legal and factual connections that link the HQAF assessments and the HQAF supplemental payments are simply not present in the distinct context of the State's fee-for-service payments. In contrast to the supplemental payments, the fee-for-service payments are not drawn from the same segregated fund as the HQAF assessments. *See* Cal. Welf. & Inst. Code § 14169.50(f)(2). Nor is there anything comparable to the express statutory policy establishing an overall link between payments into and out of the HQAR Fund in order to accomplish a distinct objective (obtaining greater federal matching funds) that is directly tied to that unique linkage. *See supra* at 20–23. Rather, Gardens Regional earned the fee-for-service

payments by providing services to individuals covered by Medi-Cal, and that fee-for-service system was an established part of California's Medi-Cal plan long before the HQAF program, with its segregated funding, was established. *See supra* at 5–8.

Moreover, the fee-for-service payments lack any factual connection to the HQAF assessments comparable to the direct factual link between the countervailing obligations in *Newbery*, both of which arose from the "very same acts" in completing Newbery's projects. 95 F.3d at 1403. And they lack the sort of close connection established by the "specialized and continuous system of estimated payments and subsequent adjustments" we addressed in *Sims*. 224 F.3d at 1012. To recognize a logical relationship between the HQAF assessments and the fee-for-service payments would be to ignore *Sims*'s admonition that "the 'logical relationship' concept is not to be applied so loosely that multiple occurrences in any continuous commercial relationship would constitute one transaction." *Id.*

The State makes two arguments in response, but neither is persuasive. First, California insists that a sufficient logical relationship is created by a provision of the HQAF statute that specifically authorizes the State to deduct unpaid HQAF assessments "from any Medi-Cal payments owed to the hospital, or, in accordance with Section 12419.5 of the Government Code, from any other state payments owed to the hospital." Cal. Welf. & Inst. Code § 14169.52(h). This argument proves too much. As the reference to California Government Code § 12419.5 confirms, this provision of the HQAF statute asserts a broad right to "offset any amount due a state agency from a person or entity"—here, the HQAF assessments—"*against any amount owing that person or entity by any state agency*." Cal. Gov. Code § 12419.5

(emphasis added). Were we to accept California's contention that its statutory assertion of such a sweeping right of setoff *alone* establishes a sufficient logical relationship to warrant recoupment, we would effectively obliterate the distinction between recoupment and setoff and thereby exempt California entirely from the Bankruptcy Code's restrictions on setoffs. To qualify as recoupment, rather than setoff, California's deduction of HQAF fees from fee-for-service payments must rest upon factual and legal connections *beyond* the mere assertion of a statutory right to make such deductions. *See Sims*, 224 F.3d at 1012–13; *Newbery*, 95 F.3d at 1403; *cf. also Malinowski*, 156 F.3d at 134 ("[A] state may not choose to define its rights in a way that defeats the ends of federal bankruptcy law.").

Second, the State argues that the necessary logical relationship between the HQAF assessments and the fee-for-service payments is shown by the fact that they both are ultimately rooted in Gardens Regional's provider agreement with the State. California notes that that contract, in turn, requires compliance with all applicable state and federal laws, including the broad setoff rights asserted by California in § 14169.52(h). For the reasons we have already explained, California's mere assertion of a broad setoff right—whether by statute or by contract—remains subject to the limitations of federal bankruptcy law. The recitation of such a setoff right, without more, does not establish that the resulting deduction is actually a *recoupment* for purposes of bankruptcy law.

Nor does anything else about Gardens Regional's standard-form provider agreement supply the necessary logical relationship between the HQAF assessments and the fee-for-service payments. Contrary to what California suggests, we did not hold in *Newbery* that the mere fact that

both countervailing obligations were in some sense rooted in the parties' contract was *alone* sufficient to establish the requisite logical relationship. Indeed, such an overbroad proposition would be contrary to *Sims*'s admonition that "the 'logical relationship' concept is not to be applied so loosely that multiple occurrences in any continuous commercial relationship would constitute one transaction." 224 F.3d at 1012; *see also* 5 Collier on Bankruptcy, *supra*, ¶ 553.10[1] ("[T]he mere fact that the relevant obligations arise under a single contract does not automatically mean that recoupment is warranted."). Rather, as explained earlier, in *Newbery* we emphasized that there was also a close *factual* link between the two obligations, because they both arose from the same underlying actions (namely, the completion of the projects that Newbery had abandoned). 95 F.3d at 1403. No such comparable link is present here. The mere fact that both payment streams arise within the overarching context of the larger Medi-Cal program is not enough, and acceptance of such a view would expand the concept of recoupment in a way that would "undermine the fundamental purposes" of the Bankruptcy Code's express limitations on setoffs. *See* 5 Collier on Bankruptcy, *supra*, ¶ 553.10[3].

## IV

We affirm the judgment of the BAP insofar as it holds that California's deduction of unpaid HQAF assessments from the supplemental payments made to Gardens Regional was permissible under the doctrine of equitable recoupment, but we reverse its judgment as to the fee-for-service payments. We remand to the BAP with instructions to remand to the bankruptcy court for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**