**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DARRIN LENALD COOPER,

*Appellant*,

v.

SOCIAL SECURITY
ADMINISTRATION,

*Appellee*.

No. 24-1084

BAP No.
1:23-bk-1098

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel

Frederick Philip Corbit, Julia W. Brand, and Gary A.
Spraker, Bankruptcy Judges, Presiding

Argued and Submitted February 11, 2025
Seattle, Washington

Filed March 20, 2025

Before: Ronald M. Gould and Jacqueline H. Nguyen,
Circuit Judges, and Richard D. Bennett, Senior District
Judge.[*]

---

[*] The Honorable Richard D. Bennett, United States Senior District Judge for the District of Maryland, sitting by designation.

Opinion by Judge Bennett

## SUMMARY[**]

### Bankruptcy

The panel (1) reversed the Bankruptcy Appellate Panel's decision affirming the bankruptcy court's order denying a debtor's motion to hold the Social Security Administration in contempt for violating the bankruptcy discharge injunction by adjusting the debtor's monthly benefits to recoup an overpayment of Social Security Disability Insurance benefits; and (2) remanded to the Bankruptcy Appellate Panel with instructions to remand to the bankruptcy court for further proceedings.

Through its own error, the Social Security Administration overpaid the debtor before his Chapter 7 no-asset discharge in bankruptcy. Two years after his discharge, it recouped the overpayment debt by reducing his monthly benefits.

The panel held that the equitable recoupment doctrine allows recovery of a discharged debt where the creditor and debtor share countervailing obligations that meet the logical relationship test. Under that test, obligations are logically related when they arise from the same transaction or occurrence such that recoupment is equitable. The panel clarified that the logical relationship test demands

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

consideration of the equities, including the purpose of the Bankruptcy Code, in each individual case. Agreeing with other circuits, the panel held that recoupment is impermissible where, as here, the Social Security Administration seeks to recoup overpayments from a bankrupt beneficiary who engaged in no malfeasance.

## COUNSEL

Marc S. Stern (argued), Seattle, Washington, for Appellant.

Kyle A. Forsyth (argued), Assistant United States Attorney; Tessa M. Gorman, United States Attorney; United States Department of Justice, Office of the United States Attorney, Seattle, Washington; for Appellee.

Thomas M. Mayer (argued) and Nancy Bello, Kramer Levin Naftalis & Frankel LLP, New York, New York, for Amici Curiae National Consumer Bankruptcy Rights Center and National Association for Consumer Bankruptcy.

# OPINION

BENNETT, Senior District Judge:

This appeal arises at the intersection of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, and the Social Security Act, 42 U.S.C. § 401 *et seq*.  Under the Social Security Act, 42 U.S.C. §§ 401, 423, the federal government operates a Federal Disability Insurance Trust Fund to provide Social Security Disability Insurance ("SSDI") benefits to qualifying individuals.  *Id.* §§ 401(b), (h); 423.  In conjunction with the old-age benefits provision of the Social Security Act, Congress established SSDI benefits "to provide workers and their families with basic protection against hardships created by the loss of earnings due to illness or old age."  *Mathews v. De Castro*, 429 U.S. 181, 185–86 (1976).  The Bankruptcy Code, which seeks to "grant a 'fresh start' to the 'honest but unfortunate debtor,'" reflects a similar concern for the effects of financial hardship.  *Marrama v. Citizens Bank*, 549 U.S. 365, 367 (2007) (quoting *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991)).  Thus, discharge in bankruptcy enjoins creditors from collecting pre-filing debts.  11 U.S.C. § 524(a)(2).

As an SSDI beneficiary who received a no-asset discharge in bankruptcy in 2020, Appellant Darrin Lenald Cooper ("Cooper"), received protections under both the Social Security Act and the Bankruptcy Code.  Through its own error, the Social Security Administration overpaid Cooper before his discharge in bankruptcy.  It then recouped the overpayment debt by reducing his monthly SSDI benefits two years after his discharge.

An issue of first impression in our Circuit, we consider whether the Social Security Administration ("SSA") may

recoup SSDI benefits it overpaid, through its own error, from a beneficiary who has already received a no-asset discharge in bankruptcy. Recoupment is an equitable doctrine that predates the Bankruptcy Code and allows recovery of a discharged debt where the creditor and debtor share countervailing obligations that meet our logical relationship test. *See, e.g.*, *Sims v. United States Dep't of Health & Human Servs. (In re TLC Hosps., Inc.)*, 224 F.3d 1008, 1011 (9th Cir. 2000). Under that test, obligations are logically related when they arise from the same transaction or occurrence such that recoupment is equitable. *Id.* at 1011, 1014.

In this case, the bankruptcy court and Bankruptcy Appellate Panel ("BAP") determined that recoupment was permissible because the overpayment and ongoing entitlement to benefits were logically related: they arose from the same disability period, disability, trust fund, and statutory scheme. The BAP effectively ended its inquiry there, suggesting that the logical relationship test precluded consideration of the equities, such as Cooper's lack of fault in SSA's overpayment. SSA urges us to adopt this view on appeal. We decline to do so.

We clarify that the logical relationship test has never precluded consideration of the equities. Indeed, the logical relationship test requires courts to evaluate such considerations to ensure that recoupment is equitable in each case. Aligning with our sister courts that have considered similar issues, we hold that recoupment is impermissible where, as here, SSA seeks to recoup overpayments from a bankrupt beneficiary who engaged in no malfeasance. Accordingly, we **REVERSE** and **REMAND** for further proceedings.

## BACKGROUND

An understanding of this appeal requires an explanation of the Bankruptcy Code, the Social Security Act, and the facts underlying Cooper's case.

### I.　Bankruptcy Code

"The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama*, 549 U.S. at 367 (quoting *Grogan*, 498 U.S. at 286–87).　Bankruptcy offers multiple paths by which individuals may seek to overcome debt.　"[C]hapter 7 of the Bankruptcy Code, which governs liquidations, embodies two ideals: (1) giving the individual debtor a fresh start, by giving him a discharge of most of his debts; and (2) equitably distributing a debtor's assets among competing creditors." *Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1203 (9th Cir. 2005).　Accordingly, Chapter 7 allows a debtor to "discharge . . . prepetition debts following the liquidation of the debtor's assets by a bankruptcy trustee, who then distributes the proceeds to creditors." *Marrama*, 549 U.S. at 367; *see also* 11 U.S.C. § 727 (defining Chapter 7 discharge).

Discharge under 11 U.S.C. § 727 "releases the debtor from personal liability for her pre-bankruptcy debts," *Boeing N. Am., Inc. v. Ybarra* (*In re Ybarra*), 424 F.3d 1018, 1022 (9th Cir. 2005), and enjoins "commencement or continuation of an action, the employment of process, or an act, to collect, recover, or offset any such debt as a personal liability of the debtor[,]" 11 U.S.C. § 524(a)(2).　The Bankruptcy Code defines "debt" as a "liability on a claim," 11 U.S.C. § 101(12), and "claim" as "a right to payment," *Id.*

§ 101(5)(A).[1]  In a "no-asset" Chapter 7 bankruptcy, debts are discharged even if a creditor does not receive notice of the bankruptcy filing.  *White v. Nielsen* (*In re Nielsen*), 383 F.3d 922, 926–27 (9th Cir. 2004).  Such discharge despite lack of notice reflects that "filing a claim is meaningless and worthless in a no-assets case."  *Id.* at 927.

## II.  Social Security Act

Under the Social Security Act, 42 U.S.C. § 401 *et seq.*, the federal government operates a Federal Disability Insurance Trust Fund ("Trust Fund") to provide SSDI payments to beneficiaries.  *Id.* §§ 401(b), (h); 423.  Workers finance the Trust Fund by paying social security taxes, which are invested in United States government securities and deposited into the General Fund of the Treasury.  *Id.* § 401(b); BARRY F. HUSTON, CONG. RSCH. SERV., RL33028, SOCIAL SECURITY: THE TRUST FUNDS 1 (2024).  Social Security income is then accounted for in trusts divided according to SSDI benefits and retirement benefits, and SSA

---

[1]  As fully defined under 11 U.S.C. § 101(5), a claim is:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Congress intended by this language to adopt the broadest available definition of 'claim.'"  *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991).

draws from the Trust Fund to distribute monthly SSDI benefits. BARRY F. HUSTON, CONG. RSCH. SERV., *supra*, at 3; 42 U.S.C. §§ 401(a), (b). Workers' tax contributions to the Trust Fund create their eligibility for benefits by earning them credits toward future benefits.[2] U.S. SOC. SEC. ADMIN., PUBL'N NO. 05-10072, HOW YOU EARN YOUR CREDITS 1–3 (2025). To receive SSDI benefits, individuals must establish their specific eligibility via an application process. 42 U.S.C. § 423(a).

SSA determines an SSDI applicant's entitlement to payment in three stages: (1) SSA determines the individual's eligibility for SSDI benefits; (2) SSA determines the individual's primary insurance amount; and (3) SSA determines the individual's correct monthly payment. In the first stage, applicants generally qualify for SSDI benefits if they meet the legal definition of "disabled," are "fully insured," and have earned sufficient credits based on covered earnings in the years preceding their application. *See* 20 C.F.R. §§ 404.110, 404.130, 404.132 (explaining required number of credits); 42 U.S.C. § 415 (explaining determination of monthly benefits amount). For SSDI benefits, the Social Security Act defines disability as blindness or "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

---

[2] In 2025, for example, individuals receive one credit for each $1,810.00 they earn, up to a maximum of four credits each year. U.S. SOC. SEC. ADMIN., PUBL'N NO. 05-10072, HOW YOU EARN YOUR CREDITS 1–3 (2025).

continuous period of not less than 12 months[.]"**3**  42 U.S.C.
§§ 423(d)(1)(A), (B).  To be fully insured, an applicant must
have earned at least one credit per year since turning 22 years
old.  *See* 20 C.F.R. § 404.110.  An applicant has sufficient
credits for SSDI benefits if he has earned 20 credits for the
10 years immediately preceding his disability.  U.S. Soc.
Sec. Admin., Publ'n No. 05-10072, *supra*, at 3.

After an individual has established eligibility for SSDI
benefits, SSA determines his "primary insurance amount,"
which is his monthly benefits amount without adjustments.
*See* 20 C.F.R. § 404.212.  An individual's primary insurance
amount is set by a formula that considers his average
monthly earnings over a specific number of years based on
his present age and the age at which he became disabled.  20
C.F.R. §§ 404.211, 404.280–404.287.    Generally, the
formula indexes an individual's social security earnings after
1950 and averages them "over the period of time [the
applicant] can reasonably have been expected to have
worked in employment or self-employment covered by
social security."  *Id.* § 404.211(a).

Finally, in the last stage of the entitlement process, SSA
determines the beneficiary's correct monthly payment.  This
stage requires SSA to consider other benefits—including
workers' compensation or other forms of Social Security
payments—that the beneficiary has received.  42 U.S.C.
§ 424a(a)(2)(B); 20 C.F.R. § 404.408.  If a beneficiary's
workers' compensation and SSDI benefits together total
more than eighty percent of his earnings before he became
disabled, SSA must reduce his monthly SSDI payments so

---

3  The parties do not dispute that Cooper meets the definition of
"disabled" under the Social Security Act.

that the total benefits amount falls below the eighty-percent threshold.  42 U.S.C. § 424a(a)(5).

Once SSA has completed every stage of the entitlement process, an SSDI beneficiary is entitled to receive monthly benefits payments in the correct monthly payment amount.[4] Such entitlements are subject to periodic review, and SSA "must evaluate [the beneficiary's] impairment(s) from time to time to determine if [he is] still eligible for payments based on disability."  20 C.F.R. § 416.989.  Additionally, Section 404 of the Social Security Act requires SSA to recover or adjust benefits "[w]henever the Commissioner of Social Security finds that more or less than the correct amount of payment has been made to any person under this subchapter . . . ."  42 U.S.C. § 404(a)(1); *see also Sullivan v. Everhart*, 494 U.S. 83, 90 (1990) (acknowledging Social Security Act mandates recovery of prior overpayments). Where a person has been overpaid, SSA must recover those benefits by (1) decreasing the person's benefits payment; (2) requiring the person to refund the amount received in excess; (3) decreasing any payment payable to that person; (4) reducing tax refunds to recover the overpayment; or (5) utilizing any combination of these four methods.  42 U.S.C. § 404(a)(1)(A).  A beneficiary subject to recovery of overpaid benefits under 42 U.S.C. § 404 may request relief based on financial need.  *See* 20 C.F.R. § 404.502(c)(1) (permitting significant need-based reductions in amount of monthly reduction of benefits).

---

[4] Monthly benefits payments are paid in "the month following the month for which they are due."  U.S. SOC. SEC. ADMIN., PUBL'N NO. 05-10029, DISABILITY BENEFITS 9 (2025).  For example, beneficiaries receive the benefits due for the month of July in the month of August.  *Id.*

Beneficiaries who have filed for bankruptcy receive protections under both the Social Security Act and the Bankruptcy Code.  Specifically, 42 U.S.C. § 407 protects future benefits payments from creditors in bankruptcy, and the bankruptcy discharge injunction precludes SSA from collecting discharged debts.  11 U.S.C. § 524(a)(2); *see also Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083, 1093 (9th Cir. 2012) ("The purpose of the exemption created by Congress in 42 U.S.C. § 407 is to protect social security beneficiaries from creditors' claims." (quoting *Dionne v. Bouley*, 757 F.2d 1344, 1355 (1st Cir. 1985))).   SSA's Program Operations Manual System ("POMS") provides nonbinding guidance to SSA employees and instructs that, even in a no-asset bankruptcy in which SSA did not receive notice, "the bankruptcy judgment will be binding on SSA with repayment (if any) limited to the terms of the discharge order unless the Office of General Counsel (OGC) is successful in objecting to the discharge." U.S. SOC. SEC. ADMIN., GN 02215.230, RESULT OF BANKRUPTCY PROCEEDINGS – PC PROCEDURE (2023).  These protections mirror the Bankruptcy Code's "fresh start" policy by seeking to protect a debtor's post-bankruptcy SSDI benefits from creditors.  *See HSBC Bank USA, Nat'l Ass'n v. Blendheim* (*In re Blendheim*), 803 F.3d 477, 485 (9th Cir. 2015) (discussing purpose of Chapter 7 bankruptcy).

## III.   Cooper's Case

On March 26, 2007, Cooper suffered a disabling injury while working for Boeing Company in Washington.  Due to his resulting disability, Cooper began receiving gross monthly workers' compensation payments of at least $4,862.25 in March 2015.  In May 2017, without the assistance of counsel, Cooper applied for SSDI benefits based on his disability.   In his application, Cooper

mistakenly reported that he had applied for but had not yet received workers' compensation benefits.  SSA denied Cooper's application, and he hired counsel to appeal the denial.

On April 30, 2019, an administrative law judge found Cooper eligible for SSDI benefits, subject to possible workers' compensation offset provisions, because he was fully disabled within the definition of 42 U.S.C. § 1382(a). On May 1, 2019, still represented by counsel from his appeal, Cooper submitted a Workers' Compensation/Public Disability Benefit Questionnaire ("Questionnaire") to the Social Security Field Office in Everett, Washington ("Everett Field Office").  The submitted Questionnaire disclosed that and accurately detailed that Cooper was receiving workers' compensation payments.  Nevertheless, Everett Field Office employees failed to properly record his workers' compensation benefits in SSA's system.

Relying in part on the improperly processed Questionnaire, SSA then determined Cooper's monthly payment, including any retroactive benefits owed.  On May 10, 2019, SSA mailed Cooper a Notice of Award ("Notice") informing him that he was entitled to SSDI benefits of approximately $2,000 per month beginning in May 2019.[5] The Notice disclosed that Cooper was also entitled to retroactive SSDI benefits dating back to May 2016 and detailed the process by which SSA would calculate the retroactive benefits owed.  The Notice then explained that

---

[5] Beginning on June 16, 2019, the State of Washington reduced Cooper's workers' compensation benefits to reflect his receipt of Social Security benefits.  Under the adjusted workers' compensation payment rate, Cooper received monthly workers' compensation payments of $3,849.11.

SSA would hold the SSDI benefits accrued between May 2016 and April 2019 pending its determination of whether Cooper had received Supplemental Security Income benefits during that period such that his SSDI benefits should be reduced.

The Notice also stated that Cooper's SSDI award may be reduced if he had received workers' compensation benefits. The Notice advised: "At that time, you may have to pay back any Social Security benefits that you were not due. Please let us know the decision on the [workers' compensation] claim right away." In August 2019, SSA disbursed $67,335.50 to Cooper, representing $73,355.50 in retroactive SSDI benefits less $6,000 withheld and paid directly to Cooper's counsel during his appeal. Because SSA previously failed to correctly record Cooper's workers' compensation benefits in its system, SSA did not account for Cooper's workers' compensation benefits when calculating the retroactive SSDI benefits. As a result, this retroactive benefits payment contained $73,112.90 in overpaid SSDI benefits.

In July 2020, Cooper filed for a no-asset Chapter 7 bankruptcy. At that time, neither Cooper nor SSA was aware that he had received more than $73,000 in overpaid benefits in August 2019. Because Cooper was unaware of the overpayment, he did not schedule SSA as a creditor in his bankruptcy, and SSA did not receive notice of his case or its discharge. The Trustee issued a report of no distribution and closed the case without setting a time for filing proof of claim. On October 21, 2020, Cooper received a discharge of his debts, including unlisted debts, under 11 U.S.C. § 727. *See In re Nielsen*, 383 F.3d at 926–27.

In November 2020, approximately two weeks after Cooper's bankruptcy case was discharged, SSA sent Cooper a letter requesting information about his workers' compensation benefits. In response, and consistent with the Questionnaire he filed with the Everett Field Office on May 1, 2019, Cooper disclosed, once again, that he was receiving workers' compensation benefits. Cooper also provided notice of his bankruptcy and explained that any debts he might owe SSA were discharged. For the next two years, Cooper continued to receive his SSDI benefits each month, subject to cost of living adjustments.

On October 30, 2022, SSA sent Cooper a letter informing him for the first time that the retroactive benefits paid to him in August 2019 had included $73,112.90 in overpaid funds. SSA stated that Cooper had not timely informed SSA of his workers' compensation benefits, which caused SSA to calculate his benefits without accounting for his workers' compensation payments. Accordingly, SSA explained that beginning in January 2023, it would hold back Cooper's monthly benefits payments until it had recovered the overpayment.[6] In the letter, SSA advised Cooper that he could (1) ask SSA to hold back less than his full monthly benefit; (2) appeal SSA's decision regarding the overpayment; or (3) request a waiver of recovery. Cooper did not request any form of relief from SSA.[7]

---

[6] The letter also explained that SSA would continue to deduct monthly Medicare premiums from his monthly checks.

[7] After the filing of the briefs in Cooper's appeal before us, Cooper administratively appealed SSA's decision regarding the overpayment. At oral argument, counsel for both parties agreed that SSA had denied Cooper's initial appeal, but his case remained pending further administrative review.

In December 2022, SSA adjusted Cooper's monthly payment by $2,498.90, which reduced his overpayment balance to $70,641.00. In January 2023, SSA began to hold back Cooper's monthly payments, and Cooper did not receive SSDI benefits that month. In response, on January 25, 2023, Cooper's bankruptcy attorney faxed and mailed to SSA a copy of Cooper's discharge order and a letter explaining that his debt to SSA had been discharged. On January 31, 2023, SSA informed Cooper's bankruptcy attorney that it would not honor the discharge because it had not received timely notice of the bankruptcy and the overpayment was not listed in the bankruptcy filing. On February 14, 2023, SSA notified Cooper that it would withhold $1,893.00 from his monthly benefits going forward.

In February 2023, Cooper reopened his bankruptcy and moved for the bankruptcy court to hold SSA in contempt for adjusting his monthly benefits in violation of the discharge injunction.[8] SSA suspended further adjustment of Cooper's monthly benefits pending resolution of litigation, and the bankruptcy court received briefing and heard oral argument on Cooper's motion. Cooper contended that any debt to SSA was discharged regardless of SSA's notice because debts owed to creditors in a no-asset bankruptcy are discharged even when they are not listed in a debtor's schedules. SSA argued that it was statutorily required to recover the overpayment, and offset was proper under the doctrine of equitable recoupment, which provides an exception to the discharge injunction.

---

[8] Cooper filed a Motion to Show Cause, which the bankruptcy court construed as a motion to hold SSA in contempt.

On May 10, 2023, after an initial hearing and supplemental briefing, the bankruptcy court issued an oral decision in favor of SSA. The bankruptcy court determined that equitable recoupment allowed SSA to recover the discharged SSDI overpayment without violating the discharge injunction in Cooper's case. The bankruptcy court explained that, in the Ninth Circuit, recoupment may apply to non-contractual entitlements subject to the logical relationship test. Applying that test, the bankruptcy court concluded that the statutory scheme supporting Social Security benefits envisions pre-petition overpayments logically linked to post-petition entitlements because it requires SSA to consider an individual's entire work history, including pre-petition benefits payments, when determining SSDI entitlements. The bankruptcy court reasoned that a "very strong logical relationship" existed because the countervailing obligations arose from the same entitlement program and basis for entitlement. The bankruptcy court suggested, however, that it would be "fair" for the Government to consider Cooper's position when addressing the timing and amount of recoupment.

Cooper timely appealed to the BAP, which affirmed the bankruptcy court. The BAP explained that the bankruptcy court had not abused its discretion because the overpayment and adjustment satisfied the logical relationship test. Specifically, the BAP determined that the pre-filing overpayment and post-filing adjustment arose from the same disability, disability period, statutory scheme, and common fund. Although the BAP acknowledged Cooper's argument that his retention of the overpayment would not offend equity, it determined that contrary Ninth Circuit law and Cooper's failure to utilize remedies within the Social Security Act precluded ruling in his favor. Finally, the BAP

concluded that the bankruptcy court had properly considered the equities because it held an evidentiary hearing and allowed supplemental briefing.

This appeal followed.[9]

## STANDARD OF REVIEW

We review the BAP's decision *de novo*, applying "the same standard of review that the BAP applied to the bankruptcy court's ruling." *Boyajian v. New Falls Corp.* (*In re Boyajian*), 564 F.3d 1088, 1090 (9th Cir. 2009). The BAP in this case reviewed the bankruptcy court's decision for abuse of discretion. A bankruptcy court abuses its discretion when it applies the incorrect legal rule or when "its application of the correct legal standard to the facts was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *USAA Fed. Sav. Bank v. Thacker* (*In re Taylor*), 599 F.3d 880, 888 (9th Cir. 2010). The scope of the bankruptcy discharge injunction is a legal issue reviewed *de novo*. *See Palmdale Hills Prop., LLC v. Lehman Com. Paper, Inc.* (*In re Palmdale Hills Prop.*), 654 F.3d 868, 875 (9th Cir. 2011).

## DISCUSSION

In this appeal, we consider whether SSA may recoup overpaid SSDI benefits from a beneficiary who has already received a discharge in bankruptcy. The equitable doctrine of recoupment is governed by the logical relationship test, which asks whether the countervailing obligations at issue arose from the same transaction or occurrence such that

---

[9] Amici curiae National Consumer Bankruptcy Rights Center and National Association of Consumer Bankruptcy Attorneys filed an amicus brief in support of Cooper's position and participated in argument virtually.

recoupment is equitable. *See Gardens Reg'l Hosp. & Med. Ctr. Liquidating Tr. v. California* (*In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*), 975 F.3d 926, 934 (9th Cir. 2020). In the proceedings below, SSA argued that the logical relationship test permits consideration of only the factual and legal connections between the countervailing obligations. The bankruptcy court did not address other equities in its opinion, and the BAP determined that our precedent precluded consideration of equitability. On appeal, SSA also argues that the Social Security Act and Bankruptcy Code can be harmonized to permit recoupment of overpaid benefits in all cases. We clarify that the logical relationship test demands consideration of equitability, including the purpose of the Bankruptcy Code, in each individual case. We conclude that recoupment is not permissible where, as here, SSA seeks to recoup overpayments it made absent any fault by a no-asset bankrupt beneficiary.

\*\*\*

As "the ancestor of the compulsory counterclaim," recoupment is an equitable doctrine preserved through judicial decisions. *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 975 F.3d at 934 (quoting *Coplay Cement Co. v. Willis & Paul Grp.*, 983 F.2d 1435, 1440 (7th Cir. 1993)). We have defined recoupment as "the setting up of a demand arising from the *same transaction* as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1399 (9th Cir. 1996) (quoting 4 *Collier on Bankruptcy* ¶ 553.03, at 553–15 (15th ed. 1995) (emphasis in original)). Recoupment is distinct from setoff, which is preserved in the Bankruptcy Code and "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay

B when B owes A.'" *Citizens Bank v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)); *see also* 11 U.S.C. § 553(a) ("[T]his title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case."). Unlike recoupment, "[t]he defining characteristic of setoff is that 'the mutual debt and claim . . . are generally those arising from *different* transactions'" that occurred before the bankruptcy. *Newbery*, 95 F.3d at 1398 (alteration and emphasis in original) (quoting 4 *Collier on Bankruptcy*, *supra* ¶ 553.03, at 553–14).

Although it is never referenced in the Bankruptcy Code, recoupment "exempts a debt from the automatic stay [or discharge] when the debt is inextricably tied up in the post-petition claim." *In re TLC Hosps., Inc.*, 224 F.3d at 1011 (quoting *United States v. Consumer Health Servs. of Am., Inc.*, 108 F.3d 390, 395 (D.C. Cir. 1997)); *see Aetna U.S. Healthcare, Inc. v. Madigan* (*In re Madigan*), 270 B.R. 749, 754 (BAP 2001) ("Since recoupment is neither a claim nor a debt, it is unaffected by either the automatic stay or the debtor's discharge."). That is, by seeking only to "defin[e] the amount owed under a single claim" without raising an independent claim or debt against the debtor, recoupment enables a creditor to recover discharged debt that would otherwise be inaccessible. *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 975 F.3d at 933 (citing *Reiter v. Cooper*, 507 U.S. 258, 265 n.2 (1993)); *see also In re TLC Hosps., Inc.*, 224 F.3d at 1011 (citing 5 *Collier on Bankruptcy* ¶ 553.10, at 553–104 (15th ed. rev. 1996)). Recoupment thus carries extraordinary power to undermine the fundamental purpose

of the Bankruptcy Code by enabling creditors to evade the discharge injunction and collect discharged debts.

"The limitation of recoupment that balances this advantage is that the claims or rights giving rise to recoupment must arise from the *same transaction or occurrence* that gave rise to the liability sought to be enforced by the bankruptcy estate." *In re TLC Hosps., Inc.*, 224 F.3d at 1011 (emphasis in original). To determine whether claims arise from the same transaction or occurrence, we apply a logical relationship test derived from Federal Rule of Civil Procedure 13(a). *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 975 F.3d at 934; *see also* FED. R. CIV. P. 13(a)(1)(A). Under that test, we ask "whether the relevant rights being asserted against the debtor are sufficiently logically connected to the debtor's countervailing obligations such that they may be fairly said to constitute part of the same transaction." *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 975 F.3d at 934 (citing *In re TLC Hosps., Inc.*, 224 F.3d at 1012; *Newbery*, 95 F.3d at 1401–02). In bankruptcy, we give "transaction" a broad construction that may include multiple logically related occurrences. *See Newbery*, 95 F.3d at 1403.

We have applied this test by evaluating the "legal and factual connections between the two countervailing obligations." *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 975 F.3d at 936. We have recognized legal relationships where claims arose from a common statutory framework or common fund. *See id.* at 938 (determining countervailing obligations' roots in common fund supported finding logical relationship); *In re TLC Hosps., Inc.*, 224 F.3d at 1013 (determining countervailing obligations' roots in statutory scheme supported finding logical relationship). We have similarly recognized factual relationships where claims

arose from a contract between the creditor and debtor. *See Newbery*, 95 F.3d at 1402–03.

"We have long held that 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code." *Law v. Siegel*, 571 U.S. 415, 421 (2014) (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)). In recognition of recoupment's power to encroach on the fresh start policy underpinning the Bankruptcy Code, we have repeatedly cautioned that "courts should apply the recoupment doctrine in bankruptcy cases only when 'it would . . . be inequitable for the debtor to enjoy the benefits of that transaction without meeting its obligations.'" *Newbery*, 95 F.3d at 1403 (quoting *Univ. Med. Ctr. v. Sullivan* (*In re Univ. Med. Ctr.*), 973 F.2d 1065, 1081 (3d Cir. 1992)); *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 975 F.3d at 934 (quoting *Newbery*, 95 F.3d at 1403); *In re TLC Hosps., Inc.*, 224 F.3d at 1013, 1014 (quoting *Newbery*, 95 F.3d at 1403; *In re Univ. Med. Ctr.*, 973 F.2d at 1081). This appeal identifies a potential tension between the logical relationship test and our precedent that equitable recoupment should apply only where it prevents a debtor from inequitably benefitting from a transaction. Before reaching the facts of Cooper's case, therefore, we clarify that the logical relationship test demands consideration of the fundamental purpose of the bankruptcy code and of the equities in each case.

## I.  Logical Relationship Test

Our prior decisions make clear that our logical relationship test demands consideration of both equitability and the purpose of the Bankruptcy Code. In *Newbery Corp. v. Fireman's Fund Insurance Co.*, 95 F.3d 1392 (9th Cir.

1996), we applied equitable recoupment to a payment dispute between Chapter 11 debtor Newbery Corporation and creditor Fireman's Fund Insurance Company. *Id.* at 1400. We explicitly provided that "we agree with the Third Circuit's observation that courts should apply the recoupment doctrine in bankruptcy cases only when 'it would . . . be inequitable for the debtor to enjoy the benefits of that transaction without meeting its obligations.'" *Id.* at 1403 (quoting *In re Univ. Med. Ctr.*, 973 F.2d at 1081). We then applied recoupment because the parties' claims arose from the same contract such that the logical relationship test, including the equitability standard, was satisfied. *Id.* at 1402–03. In so holding, we made clear that the logical relationship test evaluates the legal and factual connections between the obligations at issue to determine if those connections are sufficient to make recoupment equitable. That is, the factual and legal relationships between countervailing obligations alone cannot justify recoupment unless they establish that recoupment is equitable on the facts of the case.

In *In re TLC Hospitals, Inc.*, 224 F.3d 1008 (9th Cir. 2000), we applied the logical relationship test before separately evaluating the equitable considerations that supported recoupment. Chapter 7 debtor TLC Hospitals ("TLC"), which operated hospitals that received Medicare funding from the United States Department of Health and Human Services ("HHS"), received overpayments of $112,061 in HHS Medicare funding in 1993 but was underpaid by $68,871.71 for Medicare services in 1994. *Id.* at 1010. After TLC filed for bankruptcy, HHS sought to recoup its overpayment by deducting the 1993 overpayments from the amount it owed TLC for the 1994 underpayments. *Id.* According to the statutory scheme governing Medicare,

42 U.S.C. §§ 1395c–1395i-5, TLC received regular payments reimbursing it for the estimated cost of care to Medicare patients but agreed to audits to retroactively account for any under- or overpayment contained in the estimated reimbursements. *Id.* at 1011–12 (citing 42 C.F.R. § 413.64(f)). We concluded that this statutory framework established that "Congress rather clearly indicated that it wanted a provider's stream of services to be considered one transaction" such that the countervailing obligations were logically related. *Id.* at 1013 (quoting *Consumer Health Servs. of Am., Inc.*, 108 F.3d at 395). We then separately concluded that the equities favored recoupment because the circular system of over- and underpayments was inherent in the statutory scheme and providers could avoid the reimbursement scheme by voluntarily ceasing their provision of Medicare services. *Id.* at 1014. Our analysis of the circular statutory payment system as both a legal connection and an equitable consideration emphasized that the legal and factual underpinnings that support a logical relationship must also make recoupment equitable on the facts of the particular case. *See id.*

We explicitly acknowledged the role of the equities when we refused to apply equitable recoupment in a dispute between an individual creditor and a commercial debtor in *Aalfs v. Wirum* (*In re Straightline Investments, Inc.*), 525 F.3d 870 (9th Cir. 2008). In that case, we declined to reach the logical relationship test because we determined that the creditor had continued to lend money to the debtor in violation of the bankruptcy court's order. *Id.* at 876. We concluded that equitable recoupment could not apply "because it is an equitable remedy and equitable remedies may not be invoked to compensate someone who has engaged in inequitable conduct." *Id.* at 882.

More recently, in *In re Gardens Regional Hospital and Medical Center, Inc.*, 975 F.3d 926 (9th Cir. 2020), we permitted recoupment of some California Medicaid ("Medi-Cal") payments from a hospital in Chapter 11 bankruptcy. *Id.* at 929, 931. Gardens Regional Hospital and Medical Center ("Gardens Regional") had entered a provider agreement with Medi-Cal such that it paid Hospital Quality Assurance Fee ("HQAF") and fee-for-service payments in return for Medi-Cal payments for care to Medicaid patients. *Id.* at 930–31. HQAF funds were deposited into a High Quality Assurance Revenue Fund ("HQAR Fund"), and some HQAR Fund proceeds became supplemental Medi-Cal payments to hospitals. *Id.* at 937. Gardens Regional owed nearly $700,000 in HQAF payments, and California sought to recoup these funds by withholding more than $4 million in Medi-Cal payments. *Id.* at 931. We deemed the logical relationship test satisfied only as to the Medi-Cal funds related to HQAF payments, which arose under California's circular payment scheme by which hospitals paid into the same fund from which they received Medi-Cal payments. *Id.* at 937. We held that the funds related to unpaid fee-for-service payments failed the logical relationship test because no statutory policy linked those payments to the withheld funds and no direct factual links existed between the payments and the withheld funds. *Id.* at 939.

Before reaching the recoupment issue, however, we cautioned that courts must scrutinize the effect of recoupment in each case because of its potential to "undermine the fundamental purpose of" the Bankruptcy Code. *Id.* at 934–35 (quoting 5 *Collier on Bankruptcy*, ¶ 553.10[3] (Richard Levin & Henry J. Sommer eds., 16th ed. 2019)). For this reason, we rejected California's assertion that there was a sweeping right to setoff in the statute and

regulations governing HQAF payments established a logical relationship sufficient to permit recoupment. *Id.* at 939. Such a broad interpretation of the logical relationship test would destroy any distinction between setoff and recoupment and frustrate the fundamental purpose of bankruptcy proceedings. *Id.*

We have never held that the logical relationship test precludes consideration of the equities. Our sister circuits have addressed the role of equity under the logical relationship test. The First and Eighth Circuits have concluded that a distinct balancing-of-the-equities test is inappropriate because "[t]he 'same transaction' analysis itself inherently embodies competing issues of equity, for the simple reason that 'it would be *inequitable* for [a debtor] to enjoy the benefits of the same transaction without also meeting its obligations.'" *Terry v. Standard Ins. Co.* (*In re Terry*), 687 F.3d 961, 964 (8th Cir. 2012) (quoting *Slater Health Ctr., Inc. v. United States* (*In re Slater Health Ctr., Inc.*), 398 F.3d 98, 104 (1st Cir. 2005)). The Third Circuit, however, has rejected a logical relationship test that collapses equitability into the logical relationship between the countervailing obligations, explaining "[f]or the purposes of recoupment, a mere logical relationship is not enough." *In re Univ. Med. Ctr.*, 973 F.2d at 1081. The Second Circuit has favorably cited the Third Circuit's holding. *See Malinowski v. N.Y. State Dep't of Labor (In re Malinowski)*, 156 F.3d 131, 133 (2d Cir. 1998) ("The Third Circuit has held that 'a mere logical relationship is not enough' to warrant recoupment in the bankruptcy context." (quoting *In re Univ. Med. Ctr.*, 973 F.2d at 1081)). As detailed above, our prior cases have reiterated the Third Circuit's holding regarding the role of equitability in the logical relationship test and emphasized that recoupment is

appropriate only where it is equitable. *See Newbery Corp.*, 95 F.3d at 1403 (citing *In re Univ. Med. Ctr.*, 973 F.2d at 1081); *In re TLC Hosps., Inc.*, 224 F.3d at 1014 (citing *Newbery Corp.*, 95 F.3d at 1403; *In re Univ. Med. Ctr.*, 973 F.2d at 1081).

Our logical relationship test demands consideration of the equities, including the fundamental purpose of the Bankruptcy Code. The factual and legal connections that undergird any logical relationship must be such that recoupment is equitable on the facts of the specific case and thus will not improperly encroach on the Bankruptcy Code's policy of limiting setoff. *See, e.g.*, *In re TLC Hosps., Inc.*, 224 F.3d at 1014 ("Sound equitable considerations support HHS's right to recoup . . . If a provider in bankruptcy does not wish to be subject to Medicare's system of adjustments, it can cease providing Medicare services."); *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 975 F.3d at 938 ("And for the same reasons, allowing recoupment in the unique context presented here would not encroach upon, or undermine, the policy judgments reflected in the Bankruptcy Code's limitations on setoffs.").

We have cautioned that an overly broad interpretation of the logical relationship test would frustrate the fundamental purpose of bankruptcy proceedings. *In re Gardens Reg'l Hosp. & Med. Ctr.,* 975 F.3d at 934–35; *see also In re TLC Hosps., Inc.*, 224 F.3d at 1012 (The "'logical relationship' concept is not to be applied so loosely that multiple occurrences in any continuous commercial relationship would constitute one transaction."). Accordingly, courts may only apply equitable recoupment where it is equitable and consistent with the Bankruptcy Code's "principal purpose . . . to grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama*, 549 U.S. at 367 (quoting

*Grogan*, 498 U.S. at 286–87). This equitability component of our logical relationship test prevents recoupment from improperly defying the purpose of bankruptcy and ensures that the equitable remedy of recoupment operates within the limits of the Bankruptcy Code. *See Law*, 571 U.S. at 421. Any application of recoupment in Cooper's case, therefore, requires consideration of the equities and the purpose of the Bankruptcy Code.

## II. Recoupment of Overpaid SSDI Benefits

In this case, SSA reduced Cooper's monthly SSDI benefits in 2023 to recoup an overpayment debt discharged in Cooper's bankruptcy two years prior. The bankruptcy court and the BAP concluded that this reduction constituted permissible recoupment based on legal connections where both claims arose from the same statutory scheme and trust fund and factual connections where both claims arose under the same disability and disability period. The parties do not dispute the underlying facts, and the applicability of equitable recoupment in this case depends on whether their countervailing claims "arise from the same transaction or occurrence that gave rise to" Cooper's ongoing benefits entitlement such that recoupment is equitable. *See In re Gardens Reg'l Hosp. & Med. Ctr.*, 975 F.3d at 934 (quoting *In re TLC Hosps., Inc.*, 224 F.3d at 1011). We conclude that, despite some legal and factual connections between the overpayment and Cooper's SSDI entitlement, the application of recoupment to his case was inequitable and incongruous with the fundamental purposes of both the Bankruptcy Code and the Social Security Act.

\*\*\*

As an initial matter, we address SSA's contention on appeal that this case requires no consideration of the logical

relationship test because both the Bankruptcy Code and the Social Security Act permit recoupment. As explained above, there is no dispute that the Bankruptcy Code allows recoupment across the discharge injunction where the countervailing obligations meet the logical relationship test. *See Reiter*, 507 U.S. at 265 n.2; *In re Madigan*, 270 B.R. at 754. SSA contends that recoupment of SSDI benefits from a bankrupt beneficiary is always permissible because it is consistent with the Bankruptcy Code and the Social Security Act's provision requiring SSA to calculate benefits in a manner that accounts for prior overpayments. *See* 42 U.S.C. § 424a. Such a sweeping right to recoupment would defeat the fundamental purpose of the Bankruptcy Code and create a circuit split regarding a practice that the Social Security Act already proscribes.

As our sister courts have held, the Social Security Act protects SSDI benefits from recovery in bankruptcy and contains no language that would exempt SSA from this limitation. *See, e.g.*, *Neavear v. Schweiker* (*Matter of Neavear*), 674 F.2d 1201, 1205 (7th Cir. 1982); *Rowan v. Morgan*, 747 F.2d 1052, 1055 (6th Cir. 1984). The plain language of the Social Security Act curtails creditors' ability to access a debtor's entitlement to ongoing benefits:

> The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the

> operation of any bankruptcy or insolvency law.

42 U.S.C. § 407(a). As we have repeatedly recognized, "[t]he purpose of the exemption created by Congress in 42 U.S.C. § 407 is to protect social security beneficiaries from creditors' claims." *Bilyeu*, 683 F.3d at 1093 (quoting *Dionne*, 757 F.2d at 1355); *see also Lopez v. Wash. Mut. Bank, FA*, 302 F.3d 900, 903 (9th Cir. 2002) ("Section 407(a) was designed 'to protect social security beneficiaries and their dependents from the claims of creditors.'" (quoting *Crawford v. Gould*, 56 F.3d 1162, 1166 (9th Cir. 1995))). SSA's own internal guidance expressly provides that discharges in bankruptcy are binding on SSA such that it may only collect debts in a manner consistent with the terms of the discharge order. U.S. SOC. SEC. ADMIN., GN 02215.230, *supra*.

Moreover, the Social Security Act and its derivative regulations caution that SSA should not adjust benefits in a manner that defeats the purpose of Title II by "depriv[ing] a person of income required for ordinary and necessary living expenses." 20 C.F.R. § 404.508; *see also* 42 U.S.C. § 407. Like the Bankruptcy Code's discharge injunction, these Social Security provisions protect a beneficiary's present benefits from creditors. *See In re Blendheim*, 803 F.3d at 486. A rule permitting sweeping recoupment of every pre-filing benefits overpayment would subvert Section 207 of the Social Security Act, 42 U.S.C. § 407, by exposing bankrupt beneficiaries' entitlements to SSA as a creditor. In the context of no-asset debtors like Cooper, a sweeping recoupment right would defeat the purpose of Title II in contravention of the Social Security Act. *See* 20 C.F.R. § 404.508; 42 U.S.C. § 407. It would be akin to "ascrib[ing]

to Congress an intent to throw the Social Security claimant a lifeline that it knew was a foot short." *Sullivan v. Hudson*, 490 U.S. 877, 890 (1989).

Finally, as an equitable doctrine not mentioned in the Bankruptcy Code, "recoupment is not subject to all of the same strictures in bankruptcy as setoff." *In re Gardens Reg'l Hosp. & Med. Ctr.*, 975 F.3d at 933; *see also Newbery*, 95 F.3d at 1399 ("[T]he limits placed on setoff under section 553 generally do not apply to recoupment claims."). Recoupment is exempt from the automatic stay and the strict mutuality and pre-filing requirements that govern obligations subject to setoff.[10] *In re Gardens Reg'l Hosp. & Med. Ctr.*, 975 F.3d at 933 (citing *Newbery*, 95 F.3d at 1398–99); *see also* 11 U.S.C. § 362(a)(7) (limiting setoff under the automatic stay in bankruptcy). To prevent recoupment from undermining the fundamental protections of bankruptcy, we have carefully tempered its application by considering its equitability in each case and rejecting the assertion that a statutory scheme alone may establish a broad right to recoupment. *In re Gardens Reg'l Hosp. & Med. Ctr.*, 975 F.3d at 938–40. A sweeping right to recoupment of pre-filing overpayments from present SSDI benefits entitlements would remove such protection and expand recoupment in contravention of the "fresh start" purpose of the Bankruptcy Code. *See In re Blendheim*, 803 F.3d at 485.

We reject a sweeping right to recoupment of discharged Social Security overpayments as inconsistent with the Bankruptcy Code and the Social Security Act. Equitable recoupment only comports with the Bankruptcy Code if it is

---

[10] SSA does not argue that setoff applies to the overpayment in this case. Rather, SSA asserts that "only recoupment from benefits payments both applies to Cooper's case *and* is consistent with the discharge injunction."

equitable under the logical relationship test.  *In re Gardens Reg'l Hosp. & Med. Ctr.*, 975 F.3d at 934.  Under that test, SSA's ability to recoup a pre-filing overpayment of benefits is a fact-specific inquiry that demands consideration of the equities in each case.

***

Appropriate consideration of the equities in Cooper's case reveals that recoupment was not permissible here. Although limited legal and factual relationships existed between the overpayment and Cooper's present benefits entitlement, recoupment undermined the fundamental purpose of the Bankruptcy Code and deprived an innocent beneficiary of his income in violation of the fundamental purpose of the Social Security Act.  The logical relationship between the overpayment and subsequent adjustment was not sufficient to overcome these inequities.

### A.  Factual & Legal Relationships

As the BAP recognized, some factual relationship exists between Cooper's pre-petition overpayment and his post-petition entitlement because they arose from the same disabling condition during the same disability period.  *See In re Madigan*, 270 B.R. at 760–61 (noting factual connection where countervailing obligations arose from the same disability claim separated by an intervening bankruptcy petition).  Social Security regulations requiring beneficiaries to provide periodic updates as to their disabling condition may weaken the factual connection, *see* 20 C.F.R. § 416.989, but in this case, the record does not indicate whether Cooper updated SSA regarding a change in his qualifying disability between 2017 and 2023.  Thus, it is not entirely clear whether Cooper's present entitlement to benefits is based on a different version of his disability than

his past entitlement.  Similarly, SSA's payment of monthly benefits based on the individual's circumstances at the end of the previous month does not disrupt the factual connection in this case because the overpayment and entitlement arose during the same disability period.  *See* U.S. SOC. SEC. ADMIN., PUBL'N NO. 05-10029, DISABILITY BENEFITS 9 (2025) (explaining benefits are paid in the month after they are due).  That is, because SSA must consider prior overpayments in calculating benefits, Cooper's 2023 monthly benefits calculation would still include the 2019 overpayment under the same disability period.  *See* 42 U.S.C. § 404(a)(1).

Similarly, although the legal relationship between the pre-petition overpayment and the post-petition entitlement is somewhat tenuous, the overpayment and present entitlement arose from the same statutory scheme and the same Trust Fund.  As discussed above, the statutory scheme governing SSDI benefits requires SSA to consider workers' compensation payments and prior benefits overpayments to determine a beneficiary's correct monthly payment.  42 U.S.C. § 424a(a)(2)(B); 20 C.F.R. § 404.408.  As we explained when applying recoupment in *In re TLC Hosps., Inc.*, such a statutory requirement suggests that Congress intended some connection between prior overpayments and future benefits entitlements.  224 F.3d at 1013 (quoting *Consumer Health Servs. of Am., Inc.*, 108 F.3d at 395).

Unlike the Medicare statute at issue in *In re TLC Hospitals, Inc.*, however, the statutory scheme governing Social Security benefits does not contemplate a continuous system of estimated payments and subsequent reimbursements.  *Compare* 42 U.S.C. § 424a(a) ("If for any month prior to the month in which an individual attains retirement age . . .  (1) such individual is entitled to benefits

under section 423 of this title, and (2) such individual is entitled for such month to – (A) periodic [workers' compensation] benefits . . . (B) . . . the total of his benefits under section 423 of this title for such month . . . shall be reduced (but not below zero) by the amount by which . . . .") *with* 42 U.S.C. § 1395g(a) ("The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit . . . the amounts so determined, with necessary adjustments on account of previously made overpayments or underpayments . . . .").

Where the Medicare statute contemplated intentional overpayments by authorizing advanced payments based on estimated costs that were then adjusted to account for any prior over- or underpayment, 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.64(f), the Social Security Act requires SSA to determine the appropriate payment amount *before* disbursing funds to beneficiaries. 42 U.S.C. § 424a(a)(5). This distinction is particularly evident in Cooper's case, in which SSA spent months determining the retroactive benefits owed before disbursing any payment. Accordingly, while a limited legal relationship exists because the overpayment and present SSDI entitlement both arose under the same statutory scheme, the Social Security Act does not clearly evince Congress's intent to establish every benefits entitlement as a single transaction. As we have explained, claims' origin in the same statutory scheme is not alone sufficient to establish a logical relationship, "and acceptance of such a view would expand the concept of recoupment in a way that would 'undermine the fundamental purposes' of

the Bankruptcy Code's express limitations on setoffs." *In re Gardens Reg'l Hosp. & Med. Ctr.*, 975 F.3d at 940 (quoting 5 *Collier on Bankruptcy* ¶ 553.10 (Richard Levin & Henry J. Sommer eds., 16th ed. 2019)).

Relatedly, a limited legal relationship exists between the pre-petition overpayment and the ongoing entitlement because they arose from the same Trust Fund. Mere genesis in a common fund cannot establish a logical relationship between countervailing claims. *See id.* at 938 (applying recoupment based on common fund *and* "distinctive" payment system of continuously hospital payments into segregated funds and payments to hospitals out of segregated funds). As we have noted, "the 'logical relationship' concept is not to be applied so loosely that multiple occurrences in any continuous commercial relationship would constitute one transaction." *In re TLC Hosps., Inc.*, 224 F.3d at 1012. Even so, some logical relationship results where the overpayment and present entitlement stem from the same Trust Fund. *See In re Gardens Reg'l Hosp. & Med. Ctr.*, 975 F.3d at 937–38 (recognizing legal relationship between countervailing obligations where both obligations arose from the same Medi-Cal fund).

In the context of SSDI benefits, however, the common fund supports only a weak legal relationship because SSDI beneficiaries do not make ongoing payments into the Trust Fund from which SSA draws their benefits. First, beneficiaries necessarily receive benefits based on their prior accrual of credits because individuals can only earn credits by working. *See* 20 C.F.R. §§ 404.110, 404.130, 404.132; 42 U.S.C. § 415. The SSDI benefits program is premised on the notion that beneficiaries are unable to work enough to support themselves financially. *See, e.g.,* 42 U.S.C. § 403(a) (explaining maximum benefits); *see also* 20 C.F.R.

§ 404.1594(g) ("If the evidence shows that you are no longer disabled, we will find that your disability ended in the earliest of the following months. . . . (3) The month in which you demonstrated your ability to engage in substantial gainful activity (following completion of a trial work period) . . . ."); *Mathews*, 429 U.S. at 186 n.6 ("Again, the insurance program, unlike the public assistance provisions, was not need based, but instead was designed to protect against the specific economic hardships created by involuntary, premature retirement."). By the time a beneficiary has qualified for SSDI benefits, he has already accrued the required credits and made the required payments into the fund. Therefore, the Trust Fund does not involve a continuous stream of payments between Cooper and SSA. Cooper's payments toward the Trust Fund ceased when his disability rendered him unable to work.

Second, distinct from the hospital and payment scheme at issue in *In re Gardens Regional Hospital and Medical Center, Inc.*, workers who earn credits do not make designated payments into the Trust Fund. *See* U.S. SOC. SEC. ADMIN., PUBL'N NO. 05-10072, *supra* at 1–3; BARRY F. HUSTON, CONG. RSCH. SERV., *supra*, at 1. Workers pay social security taxes, which are invested in United States government securities and deposited into the General Fund of the Treasury, making the original tax revenue "indistinguishable from revenues in the General Fund that come from other sources." BARRY F. HUSTON, CONG. RSCH. SERV., *supra*, at 1. While Social Security income is accounted for in trusts divided according to SSDI benefits and retirement benefits, taxpayers do not allocate their payments specifically to one trust or another. *Id.* at 3. Thus, the overpayment and present entitlement are legally related because they both arose from the Trust Fund, but no circular

payment scheme bolsters that relationship. This distinction underscores the inequity of recoupment in Cooper's case.

## B. Consideration of the Equities

The factual and legal connections supporting the logical relationship between the overpayment and ongoing entitlement to SSDI benefits do not make recoupment equitable in this case. Cooper received a discharge of all his debts in bankruptcy in 2020, nearly two years before he and SSA learned of the overpayment.[11] This discharge resulted in the closure of his bankruptcy case and included even the unlisted overpayment debt because unlisted debts are discharged in a no-asset Chapter 7 bankruptcy. *See In re Nielsen*, 383 F.3d at 926–27. In the context of a disabled debtor entitled to ongoing SSDI benefits, recoupment violates our repeated warning that "courts should apply the recoupment doctrine in bankruptcy cases only when 'it would be inequitable for the debtor to enjoy the benefits of

---

[11] Significantly, we have not previously addressed recoupment in the context of debtors who had already received a discharge and closed their bankruptcy cases. Our previous recoupment precedents considered the application of recoupment across the automatic stay that applies during an open bankruptcy. *See, e.g.*, *In re Gardens Reg'l Hosp. & Med. Ctr.*, 975 F.3d at 932; *In re TLC Hosps., Inc.*, 224 F.3d at 1014. In that context, we cautioned that "'care should be taken' in applying the doctrine of recoupment in the bankruptcy context, given that 'improper application of the doctrine'" could undercut the Bankruptcy Code. *In re Gardens Reg'l Hosp. & Med. Ctr.*, 975 F.3d at 935 (quoting 5 *Collier on Bankruptcy* ¶ 553.10[3] (Richard Levin & Henry J. Sommer eds., 16th ed. 2019). We also suggested that recoupment is "scrutinized from the perspective of its effect on the fundamental policies" of bankruptcy. *Id.* The distinct timing of recoupment in this case emphasizes its inequity. Cooper had received a full discharge of his debts, including the overpayment debt, two years before either party became aware of the overpayment.

that transaction without meeting its obligations.'" *Newbery*, 95 F.3d at 1403 (quoting *In re Univ. Med. Ctr.*, 973 F.2d at 1081 (cleaned up)); *see also In re TLC Hosps., Inc.*, 224 F.3d at 1014 (quoting *Newbery*, 95 F.3d at 1403; *In re Univ. Med. Ctr.*, 973 F.2d at 1081).

Equitable recoupment in this case deprives Cooper not only of the fresh start intended by Chapter 7 bankruptcy, but also of necessary living expenses to which he is indisputably entitled in contravention of the express purpose of Title II Social Security benefits. *See* 20 C.F.R. § 404.508(a) ("Defeat the purpose of title II, for purposes of this subpart, means defeat the purpose of benefits under this title, i.e., to deprive a person of income required for ordinary and necessary living expenses."); *Sherwood Partners*, 394 F.3d at 1203 ("It is generally agreed that chapter 7 of the Bankruptcy Code, which governs liquidations, embodies two ideals: (1) giving the individual debtor a fresh start, by giving him a discharge of most of his debts; and (2) equitably distributing a debtor's assets among competing creditors."). Although this appeal presents an issue of first impression in our Circuit, the Third Circuit held in *Lee v. Schweiker*, 739 F.2d 870 (3d Cir. 1984), that recoupment of old age benefits was impermissible in part because it would undermine the benefits' purpose of "provid[ing] income to qualifying individuals."[12] *Id.* at 876. As explained above,

---

[12] The Third Circuit employs a logical relationship test that emphasizes contractual and temporal relationships, while our logical relationship test focuses on the factual and legal connections between countervailing obligations. Thus, the Third Circuit in *Lee v. Schweiker* concluded that SSA could not recoup a prior overpayment of social security benefits because social security beneficiaries are not in a contractual relationship with SSA and "the primary purpose of these statutes is to provide income

Congress enacted both the old age and SSDI benefits provisions of the Social Security Act to protect vulnerable individuals from income insecurity. *See Mathews*, 429 U.S. at 185–86. Like the Third Circuit, we conclude that recoupment of overpaid SSDI benefits from a bankruptcy beneficiary inequitably contravenes the fundamental purpose of Title II Social Security benefits.

The statutory schemes undergirding SSDI benefits and Chapter 7 bankruptcy share an intent to preserve vulnerable individuals' income security. 20 C.F.R. § 404.508; *see also* 42 U.S.C. § 404(b)(1) (recognizing recoupment of SSDI benefits is inappropriate where beneficiary "is without fault [and] such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience"); *Burkart v. Coleman* (*In re Tippett*), 542 F.3d 684, 689 (9th Cir. 2008) (discussing "fresh start" purpose of Chapter 7 bankruptcy). Cooper filed for no-asset bankruptcy, meaning that the second fundamental purpose of Chapter 7—the equitable division of assets—had limited application and his debts were quickly discharged. Chapter 7's first fundamental purpose of providing a fresh start to honest debtors, however, remained applicable to Cooper's case. So too did the Social Security Act's foundational purpose of providing income security to vulnerable individuals, especially disabled individuals. *See* 20 C.F.R.

---

security to the recipients." 739 F.2d at 876. Notwithstanding the Third Circuit's emphasis on contractual relationships under its logical relationship test, we have stated our express agreement with the Third Circuit's "observation that courts should apply the recoupment doctrine in bankruptcy cases only when 'it would . . . be inequitable for the debtor to enjoy the benefits of that transaction without meeting its obligations.'" *Newbery*, 95 F.3d at 1403 (quoting *In re Univ. Med. Ctr.*, 973 F.2d at 1081).

§ 404.508(a).     Recoupment two years after Cooper's discharge and four years after the overpayment that gave rise to his debt to SSA deprived Cooper of a fresh start and denied him financially necessary SSDI benefits.

Additional equitable considerations further disfavor recoupment.  There is no evidence that Cooper engaged in conduct that would make it inequitable for him to retain the benefit of the overpayment.  Both parties agree that the overpayment occurred at least in part due to SSA's own processing error.  Cooper's attorney submitted his workers' compensation information to SSA in 2019 during his appeal of SSA's denial of his 2017 application, and Cooper had no reason to believe SSA was unaware of his workers' compensation benefits until he received the notice from it in 2022, after the debt had been discharged.  Thus, Cooper did not deliberately mislead SSA regarding his workers' compensation benefits, and SSA had the correct information at the time that it improperly calculated Cooper's retroactive benefits award.  Cooper's failure to utilize the appeal remedies contained in the Social Security Act also does not constitute inequitable behavior.  There is no requirement that a debtor utilize administrative remedies before reopening a bankruptcy proceeding based on a creditor's alleged violation of the discharge injunction.  *See* 11 U.S.C. § 524(a)(2).     Relatedly, SSA's own POMS guidance instructs that even absent notice in a no-asset bankruptcy, "the bankruptcy judgment will be binding on SSA."  U.S. SOC. SEC. ADMIN., GN 02215.230, *supra*.  As the Second Circuit held in a similar case, we decline the invitation "to take away the unemployment insurance safety net from a debtor in bankruptcy, who has not been accused of willful wrongdoing in connection with the overpayment."  *See In re*

*Malinowski*, 156 F.3d at 135; *see also Rowan*, 747 F.2d at 1056 (emphasizing absence of fraud).

Recoupment was improper in this case because it was not "inequitable for the debtor to enjoy the benefits of that transaction without meeting [his] obligations." *See Newbery*, 95 F.3d at 1403 (quoting *In re Univ. Med. Ctr.*, 973 F.2d at 1081). Although taxpayers fund SSDI benefits such that any overpayment becomes a public burden, $73,112.90 is relatively insignificant to SSA given Cooper's individual circumstances. Unlike the commercial entities to which we have previously applied recoupment, Cooper did not earn the right to SSDI benefits by voluntarily entering a contract to assume mutual payment obligations or providing services as part of a business arrangement: he qualified and is entitled to government aid because he earned enough credits before suffering a disability that renders him unable to work. *See In re Gardens Reg'l Hosp. & Med. Ctr.*, 975 F.3d at 939; *Newbery*, 95 F.3d at 1402–03; *see also Spraic v. U.S. R.R. Ret. Bd.*, 735 F.2d 1208, 1212 (9th Cir. 1984) ("[S]ocial security benefits 'are not contractual . . . .'" (quoting *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 174 (1980))). In accordance with the statutory structure of SSDI benefits, Cooper accrued his entitlement to ongoing benefits before the events of this case transpired. Moreover, as SSA's own definition of disability acknowledges, Cooper cannot voluntarily cease his reliance on SSDI benefits. *See In re TLC Hosps., Inc.*, 224 F.3d at 1014 ("It is fair for HHS to adjust for such overpayments . . . If a provider in bankruptcy does not wish to be subject to Medicare's system of adjustments, it can cease providing Medicare services."); 42 U.S.C. § 423(d)(1)(A) (defining disability in part as "physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months"). The limited factual and legal connections between the debt and Cooper's ongoing entitlement to SSDI benefits do not make it equitable for SSA to defy the financial protection purposes of Chapter 7 bankruptcy and SSDI benefits to recover an overpayment that occurred in no small part because of SSA's own error.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the decision of the BAP and **REMAND** to the BAP with instructions to remand to the bankruptcy court for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**